LEHIGH VALLEY RAILROAD COMPANY v. BOARD
OF PUBLIC UTILITY COMMISSIONERS ET AL.

SAME v. SAME.

Nos. 24 and 54. Argued October 10, 11, 1928.—Decided November
19, 1928.

*Messrs. Duane E. Minard* and *George S. Hobart,* with whom *Mr. E. H. Burgess* was on the brief, for appellant.

26

*Mr. John O. Bigelow* for the appellees.

MR. CHIEF JUSTICE TAFT delivered the opinion of the Court.

These are two appeals from orders of a circuit judge and two district judges of the United States sitting in the District Court of New Jersey, denying to the Lehigh Valley Railroad Company injunctions sought by it in that court under § 380, United States Code, Title 28; § 266 of the Judicial Code. The defendants were the Board of Public Utility Commissioners, the Attorney General, and Francis L. Bergen, Prosecutor of the Pleas of Somerset County, all of New Jersey. The order sought to be enjoined was one made by the Board of Public Utility

Commissioners requiring the Railroad Company to eliminate two railroad grade crossings in Hillsborough Township, Somerset County, New Jersey, and to substitute for both of them one overhead crossing, to cost the railroad company $324,000. It was alleged that the change would involve unreasonable expenditure and thereby violate Par. 2, § 15, of the Act of Congress to Regulate Commerce, as amended by the Transportation Act of 1920, by interposing a direct interference with interstate commerce and imposing a direct burden thereon; that it would confiscate the property of the railroad company, deny it the equal protection of the laws and impair the obligation of a contract between the company and the State Highway Commission. The three federal judges heard the application for a temporary injunction and denied it, and on final hearing entered a decree dismissing the bill.

The state highway involved is Route No. 16, and crosses the Lehigh Valley Railroad in a direction northeasterly and southwesterly, at an angle of 29 degrees, with approaches on either side at the grade of 5 per cent. for a distance of 125 feet from the tracks. The right of way of the railroad company at this crossing is 100 feet wide and is occupied by four main operating tracks and various railroad appurtenances. 230 feet east of the center line of the crossing is a station on the westbound side of the railroad known as "Royce Valley."

At a point 1,400 feet easterly there is another grade crossing on what is called the Camp Lane Road, branching off from the highway in a southeasterly direction across the railroad at a practically level grade. The order of the Board would eliminate this crossing also.

In December, 1922, negotiations were opened between the Railroad Company and the State Highway Commission for the purpose of considering a plan for these eliminations. The negotiations continued until March 11,

1924, when the State Highway Commission adopted a resolution approving a plan of their engineer. There was public objection to it, and the negotiations continued, until finally the engineering staff of both the Company and the Highway Commission agreed on Plan C, to cost $109,000. The Railroad Company expended some $5,000 in preliminary preparation for its execution.

No contract was ever signed, either by the Railroad or the Commission. The Highway Commission had statutory power to make such a contract, but none was made other than the informal agreement between the engineering staffs.

The matter was then taken up in 1926 by the Board of Public Utility Commissioners, which was vested with authority to order railroad companies to eliminate grade crossings and to direct how they should be constructed. On November 24, the Board of Public Utilities issued an order to the Railroad Company providing for a different plan from that considered by the Highway Commission, to cost $324,000.

The Railroad Company sought to restrain the enforcement of this order by application for certiorari to a judge of the Supreme Court of New Jersey. He heard the preliminary application and an argument on the subject, together with evidence in the form of affidavits on the issue made, denied the application for a restraining order, and ordered the certiorari presented before the full Supreme Court *en banc*. The application was there presented on briefs and was denied.

A preliminary question is whether there was a contract made between the Railroad Company and the State Highway Commission, so that the order by the Board of Public Utility Commissioners would be an impairment of it and a violation of the Federal Constitution. There was certainly no legal contract completed between the Highway Commission and the Railroad Company. Plans were only

tentatively agreed upon. The expenditure of $5,000 in anticipation of the execution of the contract, to move some tracks, did not constitute an estoppel equivalent to making it or agreeing to it.

It is objected by the Railroad Company that the expense of the crossing of $324,000 is unreasonable, when it might have been constructed by an expenditure of at least $100,000 less.

The State of New Jersey, lying between New York and Philadelphia and the West, has always been a thoroughfare for intrastate and interstate commerce. The State has issued bonds to the extent of $70,000,000 for the improvements of its roads, and they now aggregate 1,500 miles in length. The highway with which we are concerned is known as Route 16, and is one of the chief arteries of travel between central New Jersey and the lake and mountain regions of the northern part of the State, northeastern Pennsylvania and the lower counties of New York. In connection with two other highway routes, it has become one of the principal roads between New York and Philadelphia. The traffic diagonally across the State is so heavy and so constantly growing that no one road can carry it all. So another route, No. 29, was authorized by the Legislature in 1927, and when it is completed, the traffic at Royce Valley crossing, already heavy, will be much increased. The highway here in question was an ancient county road laid out in 1811. It has always been a road at this point running straight 2,000 feet north of the railroad and 2,500 feet south of it.

Two plans for elimination of the two crossings were finally presented, one by the chief engineer of the Board of Public Utility Commissioners, and one, called Plan C, by the Railroad Company. The plan of the Board provided for keeping the highway straight, carrying it under a bridge of the railroad tracks with a width of 66 feet, elevating the tracks for clearance, and dividing the high-

way by a central pier of 5 feet, two roadways of 20 feet each, and two sidewalks of 10 feet 6 inches each.

Plan C provided for the vacation and abandonment of the highway where it crosses the railroad right of way, so that Route 16 would come to a dead end both north and south of the railroad. It provides further for the laying out and establishing of a new stretch of highway which would cross the railroad about 400 feet east of the present crossing. It would first have a 6 degree curve to the east. It would then have a straight course of about 250 feet to the entrance of the tunnel under the railroad tracks. A short distance beyond the tunnel a second 6 degree curve to the west would begin, and then a third 6 degree curve to the east and the roadway would join Route 16 at a point about 1,000 feet south of the intersection of the route with the center line of the railroad. It would thus have three 6 degree curves in it in about half a mile, with cuts, which at stations 100 feet apart would have 7 feet of depth at one, 10 feet of depth at another, 7½ feet of depth at a third, and 5 feet at a fourth.

Plan C provided for two roadways each 18 feet wide and a center pier 5 feet wide, making a total width of 41 feet, and would create an angle of divergence of 54 degrees. It would make the tunnel under the railroad, measured along the center pier, about 75 feet long, as against 105 feet by the Board plan. The original cost as proposed by the Railroad plan was $109,000, but by including the Camp Lane elimination, and the two sidewalks on the roadway in the tunnel, both of which were plainly needed, and the increase in the width of the tunnel roadways, the cost was increased to $205,000, and to these additions and others the Company ultimately acceded.

The chief increases in the cost of the Board plan over Plan C, as modified, are in the requirement that the highway shall remain straight, and in the circumstance that

under the Board plan the bridge of the railroad tracks must be raised to secure sufficient clearance for the use of the straight highway beneath. The tunnel and the bridge over it, if straight, must be 105 feet long, while under the railroad plan, with the three curves, and the cuts below the surface, the bridge would be only 75 feet, or shorter by one-third.

The witnesses for the Railroad testify that 6 degree curves are not dangerous, and that the additional cost of $100,000 for preserving the straight road is not within the limit of reasonableness. . The advantage of straightness in such a road through a tunnel is clear. The curves in the cuts of from 5 to 10 feet in the railroad plan would tend to increase the embarrassment of driving. and to obscure the clearness with which the drivers could see those ahead . in and through the tunnel and the curves. This highway is not infrequently crowded with vehicles. When Route No. 29 is completed, it will certainly be more crowded. The immediate prospect of using new Route 29 makes greater room in the roadways most desirable. The large expenditure to secure such advantages does not seem to be arbitrary or wasteful when made for two busy high-ways instead of one.

It is not for the Court to cut down such expenditures merely because more economical ways suggest themselves. The Board has the discretion to fix the cost. The function of the Court is to determine whether the outlay involved in the order of the Board is extravagant in the light of all the circumstances, in view of the importance of the crossing, of the danger to be avoided, of the probable permanence of the improvement and of the prospect of enlarged capacity to be required in the near future, and other considerations similarly relevant.

An increase from $200,000 to $300,000 for a railroad crossing might well, under different circumstances from

34

·those here, be regarded as so unreasonable as to make the order a violation of the company's constitutional rights and to be in the nature of confiscation. The protection of the Fourteenth Amendment in such cases is real and is not to be lightly regarded. A railroad company, in maintaining a path of travel and transportation across a· State, with frequent trains of rapidity and great momentum, must resort to reasonable precaution to avoid danger to the public. This Court has said that where railroad companies occupy lands in the State for use in commerce, the State has a constitutional right to insist that a highway crossing shall not be dangerous to the public, and that where reasonable safety of the public requires abolition of grade crossings, the railroad can not prevent the exercise of the police power to this end by the excuse that such change would interfere with interstate commerce or lead to the bankruptcy of the railroad. *Erie R. R.* v. *Board,* 254 U. S. 394. This is not to be construed as meaning that danger to the public will justify great expenditures unreasonably burdening the railroad, when less expenditure can reasonably accomplish the object of the improvements and avoid the danger. If the danger is clear, reasonable care must be taken to eliminate it and the police power may be exerted to that end. But it becomes the duty of the Court, where the cost is questioned, to determine whether it is within reasonable limits.

This follows from principles clearly established by this Court. *M. K. & T. R.* v. *Oklahoma,* 271 U. S. 303; *Mo. Pac. Ry.* v. *Omaha,* 235 U. S. 121, 129, 131; *Lawton* v. *Steele,* 152 U. S. 133, 137; *Norfolk Ry.* v. *Commission,* 265 U. S. 70, 74; *Commission* v. *Mobile R. R. Co.,* 244 U. S. 388, 390, 391; *Dobbins* v. *Los Angeles,* 195 U. S. 223. We emphasize this not because there is doubt about it, but because we deprecate the impression, apparently entertained by some, that in the safeguarding of railroad

crossings by order of state or local authority the exercise of police power escapes the ordinary constitutional limitation of reasonableness of cost. This is apt to give to local boards a sense of freedom which tempts to arbitrariness and extravagance. The case before us is one which is near the line of reasonableness, but for the reasons given we think it does not go beyond the line.

An elaborate argument is made by counsel for the Railroad Company to impeach the validity of the order of the Board of Public Utilities in this case because of the amendment to the Interstate Commerce Law, § 15-a, par. 314, § 416, contained in the Transportation Act of 1920. Based on this, it is said that the Board has no right to order these unreasonable expenditures for construction, because they exceed the legal duties of the carrier and the reasonable requirements of public safety and convenience. It is not necessary for us to controvert the proposition that unreasonably extravagant grade crossings are to be enjoined not only as violations of the Fourteenth Amendment but also as forbidden by the Transportation Act.

But we can not see that the rule invoked from either will be violated by the order now made. The care of grade crossings is peculiarly within the police power of the States, *Railroad Comm'n* v. *Southern Pacific Co.*, 264 U. S. 331, 341; and if it is seriously contended that the cost of this grade crossing is such as to interfere with or impair economical management of the railroad, this should be made clear. It was certainly not intended by the Transportation Act to take from the States, or to thrust upon the Interstate Commerce Commission, investigation into parochial matters like this, unless, by reason of their effect on economical management and service, their general bearing is clear. *Railroad Commission* v. *Southern Pacific Co.*, 264 U. S. 331. The latter case makes a distinction between the local character of

the usual elimination of grade crossings and the vital character from the standpoint of finance of the investment of large sums in the erection of a Union Station.

The final objection to the order is that the statute providing for the elimination of grade crossings by the Board of Public Utilities impinges on the constitutional rights of the Company, because it makes no provision for appeal from the decision of the Board of Public Utilities to a court with jurisdiction judicially to determine independently, on the law and facts, whether the property of the Company is being confiscated, in violation of the Fourteenth Amendment to the Federal Constitution. *Ohio Valley Water Co.* v. *Ben Avon Borough,* 253 U. S. 287. In that case, the Public Service Commission of Pennsylvania instituted an investigation and took evidence upon a complaint charging a water company with demanding unreasonable rates. The Commission fixed the valuation of the Company's property and established rates on that basis. The Company contended that the valuation upon which the income was calculated was much too low, and deprived it of a reasonable return and therefore confiscated its property. On appeal to the Superior Court, that court reviewed the certified record, appraised the property, reversed the order and remanded the proceedings with directions to authorize rates sufficient to yield 7 per centum of the sum. The Supreme Court reversed the decree, saying that there was competent evidence tending to sustain the Commission's conclusion, and as no abuse of discretion appeared, the Superior Court could not under the Pennsylvania statute interfere. This Court held on error that, because the plaintiff in error had not had proper opportunity for an adequate independent judicial hearing as to confiscation on the law and the facts, the challenged order was invalid, and that the judgment of the Supreme Court of the State must be reversed.

We do not think the *Ben Avon* case applies here. In this case Chapter 195 of the Laws of 1911 of New Jersey created a Board of Public Utility Commissioners and prescribed its duties and powers. By §§ 21 and 22 of that Act, the Board is vested with authority to protect the traveling public at grade crossings by directing the Railroad Company to install such protective device or devices, and adopt such other reasonable provision for the protection of the traveling public at such crossing, as in the discretion of the Board shall be necessary.

Section 38 of this Act, as amended by Chapter 130 of the Laws of 1918, provides that any order made by the Board may be reviewed upon certiorari after notice, and the Supreme Court is given jurisdiction to review the order, and to set it aside when it clearly appears that there was no evidence before the Board reasonably to support the same, or that the same was without the jurisdiction of the Board. If it should appear equitable and just that a rehearing be had before the Board, the Supreme Court may determine that such hearing be had, upon such terms and conditions as are reasonable.

The language of § 38 in respect to the appeal to the Supreme Court is much broadened by the construction of that court. It has been established by its decisions that the Legislature of New Jersey may not impair the powers of the Supreme Court and the Court of Chancery as they existed when the State Constitution was adopted, and there is much latitude in their jurisdiction growing out of this. *Traphagen* v. *West Hoboken,* 39 N. J. L. 232; *Flanigan* v. *Guggenheim Smelting Co.,* 63 N. J. L. 647; *In re Prudential Insurance Co.,* 82 N. J. Eq. 335.

The case of *Public Service Gas Co.* v. *Board of Comm'rs,* 84 N. J. L. 463, s. c. 87 N. J. L. 581, construing § 38, as amended, is an illustration. It came before the Supreme Court on certiorari for consideration whether rates

fixed by the Board for a Public Service Gas Company of Passaic were unjust, discriminatory and unreasonable. The Supreme Court said of § 38 [p. 466]:

" If this language is taken literally, we should be powerless in any case within the jurisdiction of the Board to set aside its order if there 'was any evidence to support it, no matter how overwhelming the evidence to the contrary might be. It is needless to say that such a literal construction of section 38 would bring it into conflict with our constitution. It needs no act of the legislature to confer on us the power to review the action of an inferior tribunal, and the legislature can not limit us in the exercise of our ancient prerogative. That the legislature did not intend to do so is made clear by a consideration of the whole act. We are, by the express terms of section 38, authorized to set aside the order when it is without the jurisdiction of the board. The jurisdiction of the board to fix rates is, by section 16c, limited to cases where the existing rate is unjust, unreasonable, insufficient or unjustly discriminatory or preferential. The only words important for the present case are unjust and unreasonable, since the commissioners themselves went no further in their adjudication. To determine then whether the commissioners had jurisdiction, we must first determine whether the existing rate was unjust and unreasonable, and in determining that fact we are not limited to the question whether it clearly appears that there was no evidence before the board to support reasonably its order; section 16c does not purport to limit the scope of our inquiry into the fact, and we must therefore determine it in the usual way according to the whole of the evidence."

The Supreme Court proceeded itself to consider all the evidence in the case and to find whether the old rate was unreasonably high and the new rate reasonable. It said [p. 468]:

"All these considerations lead us to the conclusion that if there is any presumption in favor of the order of the commissioners, it depends, like the opinion of the court of another state, upon the strength of the reasoning by which it is supported. This is subject, however, to the qualification that in legislative action the courts will not merely substitute their judgment for that of a legislative body.

" We must, therefore, determine for ourselves upon all the evidence whether the former rate for gas in the Passaic district was unjust and unreasonable, and whether the new rate is just and reasonable."

The case went to the Court of Errors and Appeals, and the action was affirmed on that opinion. There may be some confusion in a review of cases on certiorari by the Supreme Court of New Jersey; but the *Passaic* case has never been overruled, and under it there is an appeal to a court which may examine the facts and the law independently as to the justice and reasonableness of the order. It is true that the court said that the case before it was not technically a confiscation case but it resembled it so much that it used cases from this Court on confiscation to guide its rulings, and said:

" Since all cases of the kind may come before that tribunal and its decisions upon the constitutional questions would be binding upon us, we ought to adopt the same rule."

The *Passaic* case was followed in the consideration of the same § 38 in *Erie R. R.* v. *Board,* 89 N. J. L. 57; s. c. 90 N. J. L. 672, a grade crossing case, in which the Supreme Court said [p. 68]:

" The next ground of attack is that the evidence taken before the board of public utility commissioners does not justify or reasonably support the board's conclusion or findings. To that end, the insistence is, that this court

has power and should review the board's findings of fact. We understand such to be the power of this court."

Objection is further made to this remedy before the Supreme Court, that it is by certiorari and is within the discretion of the Court. That, however, is hardly a serious obstacle. As Chief Justice Kinsey, in *State* v. *Anderson*, 1 N. J. L. 318, 320, said:

". . . as upon a certiorari the court have by law a discretionary power, I do not mean by this a power to do what they please not directed by law and precedents, but, to employ the language of a great judge, to be confined to those limits, within which an honest man competent to the discharge of the duties of his office ought to be confined; . . ."

This Court said of provisions for certiorari in a California statute like this, *i. e., Nappa Valley Electric Co.* v. *Railroad Comm'n*, 251 U. S. 366 [p. 372]:

"In those cases the applications for writs of certiorari were denied, which was tantamount to a decision of the Court that the orders and decisions of the Commission did not exceed its authority or violate any right of the several petitioners under the Constitution of the United States or of the State of California."

But if for any reason that remedy, as defined in those decisions, should not be available or should be inadequate, it would seem to be clear that resort then might be had to the Court of Chancery. In *Allen* v. *Distilling Co.*, 87 N. J. Eq. 531, the Court of Chancery in New Jersey used this language [p. 543]:

"So long as courts of equity are to serve the purpose of the creation of the court of chancery of England, and in this state the court of chancery is the sucessor, in all that such term implies, of that court, jurisdiction must depend only upon the existence of, or a threatened wrong, and the absence of an adequate remedy at law. . . . Due to our habit of endeavoring to find decided cases to fit each

situation, we too often overlook the fundamental reasons for the creation or evolution of the court. It received no grant of express powers nor were express duties imposed upon it. The law courts were left to deal with the violation of all rights for which they could give an adequate remedy. The duty of relieving against any remaining wrongs was imposed upon the court of chancery."

We are of opinion that the infirmity in the Pennsylvania statute which was pointed out in *Ohio Valley Co.* v. *Ben Avon Borough* is not present in the New Jersey statutes.

*Affirmed.*

MR. JUSTICE McREYNOLDS is of opinion that the action of the Board of Public Utility Commissioners was unreasonable and arbitrary and should be set aside. To permit the Commissioners to impose a charge of $100,000 upon the Railroad under the pretense of objection to a six per cent. curve in a country road is to uphold what he regards as plain abuse of power.