In the Matter of the Proceeding, under the Grade Crossing Elimination Act, for the Elimination of the Existing Highway-Railroad Crossings at Grade of the Railroads Operated by the New York Central Railroad Company and Erie Railroad Company and Cleveland Avenue, Eleventh Street, Thirteenth Street, Twenty-fourth Street, Twenty-seventh Street, Packard Road, Hyde Park Boulevard, Fifty-sixth Street, Seventy-second Street, Eighty-seventh Street, Cayuga Drive, South Military Road and One Hundred and Second Street, of the Railroad Operated by the New York Central Railroad Company and Main Street, Niagara Street, Second Street, Third Street, Quay Street, Ninth Street and New Road, and of the Railroad Operated by Erie Railroad Company and North Avenue, Ontario Avenue, Niagara Avenue, South Avenue, Lockport Street, Michigan Avenue, Portage Road, Cedar Avenue and Falls Street in the City of Niagara Falls; and the Highway-Railroad Crossing at Grade of the Railroad Operated by The New York Central Railroad Company and Lockport Road in the Town of Niagara, Niagara County. (Case No. 6607.)

THE NEW YORK CENTRAL RAILROAD COMPANY and the ERIE RAILROAD COMPANY, Appellants; PUBLIC SERVICE COMMISSION OF THE STATE OF NEW YORK and CITY OF NIAGARA FALLS, Respondents.

Fourth Department, May 5, 1937.

*Howard R. Sturtevant,* for the New York Central Railroad Company.

*S. Fay Carr,* for the Erie Railroad Company.

*Sherman C. Ward,* for the Public Service Commission.

*J. William O'Brien, Corporation Counsel,* for the City of Niagara Falls.

EDGCOMB, J. We have before us for review an order of the Public Service Commission designating for elimination some forty-

three grade crossings of the New York Central and Erie railroads. The order is a final one, and specifies the manner in which the eliminations are to be made, and directs the railroad companies to proceed with all convenient speed to prepare the necessary plans and estimates of costs. The proceeding was instituted on the motion of the Commission, pursuant to the provisions of the so-called Grade Crossing Elimination Act (Laws of 1928, chap. 678, as amd.).

The present lines of the two companies are contiguous from the easterly city line of Niagara Falls for a distance of some five miles, and pass through a thickly-settled portion of the city, including a part of the business area. The tracks then separate, the Erie diverging to the north and running to its freight yards, and the Central continuing to its station at · Falls avenue and Second street, and thence north to Suspension Bridge and beyond.

The order requires the practical abandonment of approximately eight miles of the double-track main line of the Central, and a like distance of the single track of the Erie, and the relocation of the line of both roads on an entirely new right of way around the city.

The record, in our opinion, fails to disclose sufficient facts to warrant the granting of the order.

We recognize that the Legislature has given the Public Service Commission, rather than the courts, jurisdiction over the abolition of dangerous highway crossings over the various railroads within the State. We have no purpose, much less desire, to substitute our judgment for that of the Commission. A duty, nevertheless, is imposed upon the court to keep the Commission within the law, and to protect the legal and constitutional rights of the railroad companies. (*People ex rel. New York & Queens Gas Co. v. McCall,* 219 N. Y. 84, 87; affd., 245 U. S. 345; *Matter of New York, Ontario & Western R. Co.,* 244 App. Div. 664, 666, 667; affd., 271 N. Y. 567.)

An order of this character, which will eventually result in the expenditure of millions of dollars, should never be hastily granted, and not at all until a well-considered and comprehensive plan has been worked out — one which appears to be best adapted to bring about the desired end, taking into consideration the rights of the railroad companies and the welfare of the public. The expense connected with this enterprise is apportioned between the public and the railroad companies. Neither should be required to spend a dollar unless the public welfare requires it, and then no more than is reasonably necessary to remedy the existing evil. The final decision should rest upon something other than the mere

wish of public-spirited individuals to get the tracks out of the center of the city, and upon something more than a mere rough calculation of the resulting cost.

The safety of the public was the incentive which induced the appropriation of $300,000,000 to aid in the elimination of grade crossings and the passage of the legislation which made it possible to bring about that end. (*Matter of N. Y. C. R. R. Co.* [*Eddy & Sullivan Crossings*], 229 App. Div. 607, 611; appeal dismissed, 255 N. Y. 320.)

The report of the grade separation engineer shows that from 1920 to 1933 there were one hundred and six accidents on the two roads within the city limits, which resulted in fatalities in seventy-seven instances, and in personal injuries, more or less serious, on sixty-two other occasions. The cause or nature of these accidents does not appear. Niagara Falls has a population of upwards of seventy-five thousand, and from two to three million tourists visit the city annually. It is common knowledge that with increasing traffic there is added danger of accidents at any grade crossing where there are frequent train movements. There is, without doubt, evidence in the record to indicate that the safety and welfare of the public will be promoted by an elimination of the crossings in question by some feasible method. That does not mean, however, that the present order, which requires so drastic a change in the location of the tracks, is necessarily justified.

Subdivision 5 of section 2 of chapter 678 of the Laws of 1928 requires that the elimination order shall determine, among other things, " the manner in which such elimination shall be made." The order in question provides that the separation of grades shall be made " substantially as shown by exhibits 6, 7 and 8." These exhibits are (1) a small map with a penciled tracing showing in general the relocation of the tracks from the LaSalle area northwesterly to the Suspension Bridge area in the vicinity of the present Military Road crossing; (2) a schematic diagram showing a further extension from Military Road westerly to the present connection with the Michigan Central bridge across the river, and " a suggestion " of a Lehigh Valley connection with the existing Central tracks; (3) a profile of the proposed alignment from the LaSalle area to the Military Road crossing. There is no profile of the proposed route beyond the Military Road. No details are shown on any of these maps. They are mere suggestions in outline rather than a portrayal of a finished plan. While the exact details of the project need not be incorporated in the order, the data referred to in the present instance is altogether too sketchy, incomplete and indefinite to comply with the statute or to justify the railroads in proceeding with the work.

The proposal which has been adopted was presented by Mr. Vanneman, a well-known and competent engineer employed by the city of Niagara Falls. He constantly refers to it as a " scheme." He admits that certain features will require further study; that no details have been considered in connection with the Erie track extending westerly from Military Road to the gorge; that many changes in the physical conditions of the territory around the freight yard will have to be made, including alterations of the streets and the existing buildings. It is quite apparent from his testimony that he has not worked out his " scheme " with sufficient detail, or given the subject that broad, comprehensive and minute study and attention which would warrant its adoption by the Commission without change or alteration, and without adequate reflection or research on its part.

In speaking of the program suggested by the city, and which has been adopted by the Commission, the grade separation engineer in his report says: " No precise data was offered to show that this method was suitable or could be accomplished at a reasonable cost; however, this scheme may be entirely feasible and economical and have decided advantages over the possibility of elevating the railroads or changing grades of streets to produce eliminations on the present alignment of the railroads, and in the absence of more definite plans and cost data can be used as the basis of an order."

Certainly the Legislature could never have intended that a final determination, requiring the railroad companies to proceed with a project involving an expenditure of this magnitude, the wisdom of which the engineer of the Commission who conducted the hearing frankly admits is more or less problematical and speculative, should rest for its authority on a mere chance that the plan adopted would prove feasible, and that it could be accomplished at a reasonable cost, and might have advantage over other suggested plans which the Commission did not see fit to investigate. Such an order would indeed be dogmatic, arbitrary and unreasonable.

Mr. Vanneman is the only witness who attempted to venture a prediction as to what this project will cost. He frankly admits that no detailed estimate has been prepared; he claims that " a rough calculation " will indicate that the construction can be made within the $12,500,000 originally set apart for this project. He does not even tell us the facts upon which he bases his " rough calculation." He admits that it will be necessary to acquire additional rights of way, and that " the taking of these properties may take away certain residences or other buildings which are now located adjacent to the New York Central right of way." It

is common knowledge that the acquisition of new rights of way is many times a most expensive item, especially where buildings are involved. We are given no idea of the amount, nature or cost of this new right of way. Mr. Vanneman suggests the possibility of the Erie utilizing a portion of the Central's right of way, but that, of course, could only be done with the latter's consent, and no one would expect such concession to be made gratuitously. How much it would cost we cannot even guess. In his report to the Commission the grade separation engineer says: " No estimate of cost is provided, and, therefore, the Commission is without knowledge upon which to base a finding as to public welfare."

Certainly a " rough calculation " of the cost cannot take the place of a reasonably accurate estimate, nor will it justify the Commission in making a final determination which will eventually result in the expenditure by the public and the railroad companies of a sum which concededly will run into the millions — just how many no one seems to know.

While the State, in the exercise of its police power, has the constitutional right to require a railroad company to do away with a dangerous highway crossing, that does not mean that disbursements of large sums, unreasonably burdening the company, will be justified, if a less expenditure can properly accomplish the desired object. (*Lehigh Valley R. R. Co.* v. *Board of Public Utility Comrs.*, 278 U. S. 24, 34.)

Neither should the public be compelled to share in an expense which is out of all proportion to the benefit to be derived from the improvement. Waste of public funds and useless expenditure of money are always to be avoided.

We do not mean to be understood as saying that before an elimination order can properly be granted the Commission must have before it the exact amount which the improvement will cost; that, of course, would be impossible. But we do say that such an order should never be made on " a rough calculation " of the necessary expenditure. Both the railroad companies and the public should have some fairly accurate idea of the amount which they will be required to spend, so that they may govern themselves accordingly.

Furthermore, it does not appear that the Commission has given any consideration or study to other methods by which the grades of the streets and the railroads could be separated. The companies suggest, if the elimination is to take place, that their tracks be elevated on the present right of way, and the highways be made to pass underneath. The relative cost of the two methods was not investigated. It was assumed by Mr. Vanneman that it would

be substantially the same. We find no basis for the assumption. If it should turn out that one method was much cheaper than the other, that fact would be an item of importance which should be carefully considered in determining the method which should be finally adopted to accomplish the desired end.

Certainly the suggestion of elevation on the present alignment is not so absurd as to warrant its being entirely ignored, even though the railroads failed to present evidence of an engineering nature as to its cost or desirability. The plan would eliminate all crossings at grade as completely as if the roads were sent around the city.

Furthermore, the proposal adopted will not entirely do away with these various crossings at grade. It will be necessary, according to Mr. Vanneman, "to leave in place at least one track of each railroad for the purpose of providing a means of reaching the major industries now developed along them." While these tracks would not be used for passenger service, or for freight going to the yards or beyond, they would be used to reach the various industries along the present line. The extent of these movements is not even estimated. The grade crossings in the business and thickly settled portion of the city would still remain, the danger of accidents would continue, and congestion in traffic would still be caused by slow and prolonged switching movements.

Undoubtedly the Commission may, in a proper case, make an order requiring a railroad company to abandon its then line of road, and relocate its tracks at another point, but that can only be done where such change of location is necessary to effect the elimination of a dangerous crossing. (Laws of 1928, chap. 678, § 2, subd. 5.) The change cannot be ordered unless it is reasonably necessary to abolish such crossing; the necessity must be shown by clear and convincing evidence. The record is devoid of such evidence.

We recognize that this is largely an engineering problem. We are well aware that, in the final analysis, the Commission, after a full and exhaustive investigation, must exercise its sound judgment and discretion, within the limits prescribed by the law. By what has been said we do not intend to be understood as favoring any particular plan. That question is not before us, nor is it for us to determine.

It appears that an investigation is being made by the Federal Co-ordinator of Transportation in regard to unnecessary duplication of service and facilities in the Niagara Falls area. Such decision would, doubtless, have an important bearing on the advisability of any new route to be adopted. If there is a reasonable ground

to expect a decision in the near future, a short delay in the present proceeding might result in an order which would save expense, and give satisfaction to the public as well as to the railroad companies. Indefinite postponement of action by the Commission awaiting the action of some Federal agency is unnecessary.

In the exercise of our discretion we feel that the order appealed from should be reversed, and that the matter should be remitted to the Public Service Commission for further investigation and consideration, and that a rehearing should be had, at which time all parties may have full opportunity to present such evidence as they deem proper and relevant to the inquiry.

All concur; THOMPSON, J., having been present at the argument of said appeal, but having died on the 7th day of April, 1937, without having taken any part in the determination of this appeal. Present — SEARS, P. J., EDGCOMB, CROSBY and LEWIS, JJ.

Order reversed on the facts as matter of discretion, with costs, and matter remitted to the Public Service Commission in accordance with the opinion.