**ZIFFRIN, Inc., v. MARTIN et al.**
**No. 1210.**

District Court, E. D. Kentucky, Frankfort.
Oct. 15, 1938.

Hubert R. Meredith, Atty. Gen., and William Hayes and Harry D. France, Asst. Attys. Gen., for defendants.

Norton L. Goldsmith, of Louisville, Ky., Howell Ellis, of Indianapolis, Ind., and Selligman, Goldsmith, Everhart & Greenbaum, of Louisville, Ky., for plaintiff.

Before HAMILTON, Circuit Judge, and NEVIN and SWINFORD, District Judges.

SWINFORD, District Judge.

The plaintiff, Ziffrin, Incorporated, filed its bill of complaint against the officers charged with the responsibility of enforcing the liquor control laws of the State of Kentucky, and seeks to enjoin the enforcement of the provisions of the Alcoholic Beverage Control Law of Kentucky.

The defendant filed a motion to dismiss the plaintiff's bill.

The question for determination is the constitutionality under the federal constitution of the Alcoholic Beverage Control Law of Kentucky, enacted at the 1938 session of the General Assembly.

It is alleged that since March 20, 1933, and at all of the times involved, the plaintiff, Ziffrin, Incorporated, has been and is an Indiana corporation, domiciled at Indianapolis, Indiana, authorized by its charter to engage, and actually engaged, in the business of an interstate contract carrier of freight by motor vehicle for hire.

On July 1, 1935, and prior thereto, plaintiff was in bona fide operation as a contract carrier by motor vehicle between Louisville, Kentucky, and Chicago, Illinois, and elsewhere, conducting operations in interstate commerce along and over Federal Aid Highway, U. S. No. 31, from Louisville northwardly. On September 30, 1935, the Interstate Commerce Commission properly extended to and including February 12, 1936, the time within which interstate contract carriers might file applications for permits. Prior to February 12, 1936, plaintiff filed application with the Interstate Commerce Commission for a permit as an interstate contract carrier of freight for the aforementioned territory and route, which application has continued, and now continues, pending and undetermined before the Interstate Commerce Commission, with the consequence under Federal Motor Carrier Act 1935, § 209, 49 U.S.C.A. § 309, that the continuance of plaintiff's operations has been and is lawful.

In October and November, 1936, plaintiff entered into contracts with Schenley Products Company and Joseph E. Seagram & Sons, Inc., and their affiliates, all engaged in the business of whiskey distillers, to transport for hire by motor vehicles consignments of whiskies to be delivered by said bailors to the plaintiff in Louisville, Kentucky, consigned by bailors for delivery to the consignee-purchasers of said whiskies at such consignees' places or residence or business location in Chicago, Illinois, and in points other than the State of Kentucky. These contracts have continued to be and are in full force and effect; the plaintiff has carried large quantities of whiskies pursuant thereto and conformably therewith and plaintiff has done like and similar business with and for other customers.

The direct, convenient and usual motor vehicle route from Louisville to Chicago is via Indianapolis over U. S. Highway No. 31, and that route has been used and employed by plaintiff in its operations.

The transportation of this whiskey has been the principal part of plaintiff's business and that business has been and is an established and profitable one.

The business has been interstate commerce exclusively.

During the year preceding July 1, 1938, plaintiff owned and operated seven trucks, operated a total of twenty-five trucks, employed forty men, and had in the business a capital investment in excess of $10,000.

On March 7, 1938, the Governor of Kentucky approved the Alcoholic Beverage Control Law known as Carroll's Kentucky Statutes, Supp.1938, § 2554b-97 et seq.

Plaintiff previously had complied with all requirements of Kentucky laws governing licenses, certificates and process agent.

Insofar as its license provisions are concerned, this law became effective July 1, 1938, and it thereupon became incumbent upon plaintiff, if it were to continue its aforementioned business conformably with the terms of the law, to have a Transporter's License. 1938 Supplement to Carroll's Kentucky Statutes, § 2554b-190.

Section 18 of the Act, Acts 1938, c. 2, referred to in this Statute is subsection 7 of Section 2554b-114, Carroll's Kentucky Statutes, Supp.1938.

In order to be eligible to obtain the Transporter's License from the Department of Revenue, it was necessary for plaintiff to have a common carrier's certificate from the Division of Motor Transportation. 1938 Supplement to Carroll's Kentucky Statutes, § 2554b-154 (7).

On May 25, 1938, plaintiff applied for a Liquor Transporter's License, paid the required fee, and with surety executed the bond required therefor, and on June 7, 1938, plaintiff applied to Division of Motor Transportation for a common carrier's certificate to operate a motor freight line from Louisville, Kentucky, to the Indiana State line over U. S. Highway No. 31 and in interstate commerce only.

On or about June 30, 1938, plaintiff's application for a common carrier's certificate was denied; plaintiff thereby was rendered ineligible to obtain or to receive a Transporter's license and on July 8, 1938, the Commissioner of Revenue and the Alcoholic Beverage Control Board denied the application for a Transporter's license on the ground that it did not hold a common carrier's certificate.

The bill charges the law to be unconstitutional insofar as it assumes to bar plaintiff from engaging in interstate commerce as a contract carrier. The bill, as amended, charges the law to contravene the Commerce Clause, the Due Process and Equal Protection Clauses, U.S.C.A. Const. art. 1, § 8, cl. 3; Amend. 14, § 1.

Counsel for the plaintiff contend that this statutory three judge court has no jurisdiction to entertain the motion to dismiss. An examination of the cases cited

to support this plaintiff's claim reveals that two of them were decisions rendered before Section 266 of the Judicial Code, was amended in 1925. This amendment added the last sentence to Section 266 of the Judicial Code, 28 U.S.C.A. § 380, which is as follows: "The requirement respecting the presence of three judges shall also apply to the final hearing in such suit in the district court; and a direct appeal to the Supreme Court may be taken from a final decree granting or denying a permanent injunction in such suit."

The amendment expressly states that the three judge court must sit in final hearing and hence grant a final decree.

The Supreme Court, in the case of Stratton v. St. Louis Southwestern Ry. Co., 282 U.S. 10, 14, 51 S.Ct. 8, 9; 75 L. Ed. 135, said: "By the amendment of February 13, 1925 (43 Stat. 938), the provision with respect to the presence of three judges was made to apply also to the final hearing in such suit in the District Court, and from the final decree, granting or denying a permanent injunction, a direct appeal lies to this Court. * * * "These purposes were not altered by the amendment of the statute, which was designed to end the anomalous situation in which a single judge might reconsider and decide questions already passed upon by three judges on the application for an interlocutory injunction."

■ Under the Act, as amended, the three judge court has the same power as a single district judge. It is in fact a district court composed of three judges instead of one. One of the questions for determination is the sufficiency of the pleadings to state a cause of action. The only way in which this can be determined is to decide whether or not the Kentucky Statute is constitutional.

■ We are of the opinion that this three judge court has authority to rule upon this motion to dismiss.

If this Act of the Kentucky Legislature does not violate the guarantees under the federal constitution to those engaged in interstate commerce it is valid only because it is a reasonable exercise of the police power of the sovereign State of Kentucky.

■ The legislature determines what regulations are proper and necessary in the exercise of the police power and it is not for the courts to pass upon the wisdom, policy or expediency of the laws passed in exercising this sovereign power. Halter v. Nebraska, 205 U.S. 34, 27 S.Ct. 419, 51 L.Ed. 696, 10 Ann.Cas. 525. In this case Mr. Justice Holmes in the opinion laid down the basic rule of construction in the following language [page 421]: "In our consideration of the questions presented we must not overlook certain principles of constitutional construction, long ago established and steadily adhered to, which preclude a judicial tribunal from holding a legislative enactment, Federal or State, unconstitutional and void, unless it be manifestly so. Another vital principle is that, except as restrained by its own fundamental law, or by the supreme law of the land, a state possesses all legislative power consistent with a republican form of government; therefore each state, when not thus restrained, and so far as this court is concerned, may, by legislation, provide not only for the health, morals, and safety of its people, but for the common good, as involved in the well-being, peace, happiness, and prosperity of the people."

■ It then becomes the duty of the courts to determine what are proper subjects for the exercise of this power, what constitutional restrictions and limitations must be applied and whether the statute in question is a reasonable exercise of the power. In this connection the courts may apply certain tests to the legislation and may judicially determine whether the law has a real and substantial relation to the public welfare, safety and health and actually tends in some real degree to promote these objects. Mugler v. Kansas, 123 U.S. 623, 8 S.Ct. 273, 31 L.Ed. 205.

■ The basis of the police power lies in the constitution which regards the public welfare, safety and health of the citizens of that state. However, a close examination of the authorities will show that whenever there is a conflict between the police power and the constitution the courts will construe the constitution to fit in with the police regulations if at all reasonable.

In the case of Townsend v. Yeomans, 301 U.S. 441, 57 S.Ct. 842, 81 L.Ed. 1210, the court said [page 848]: "The case calls for the application of the well-established principle that Congress may circumscribe its regulation and occupy a limited field, and that the intent to supersede the exercise by the state of its police power as to matters not covered by the federal legislation is not to be implied unless the latter

fairly interpreted is in actual conflict with the state law. Savage v. Jones, 225 U.S. 501, 533, 32 S.Ct. 715, 56 L.Ed. 1182; Atlantic Coast Line R. Co. v. Georgia, 234 U.S. 280, 293, 294, 34 S.Ct. 829, 58 L.Ed. 1312; Illinois Central R. Co. v. Public Utilities Comm., 245 U.S. 493, 510, 38 S. Ct. 170, 62 L.Ed. 425; Carey v. South Dakota, 250 U.S. 118, 122, 39 S.Ct. 403, 63 L.Ed. 886; Lehigh Valley R. Co. v. Public Utility Com'rs, 278 U.S. 24, 35, 49 S. Ct. 69, 72, .73 L.Ed. 161, 62 A.L.R. 805; Atchison, T. & S. F. Ry. Co. v. Railroad Comm., 283 U.S. 380, 392, 393, 51 S.Ct. 553, 556, 75 L.Ed. 1128; Hartford Accident & Indemnity Co. v. Illinois, 298 U. S. 155, 158, 56 S.Ct. 685, 686, 80 L.Ed. 1099."

The expressly granted power of the federal government to regulate interstate commerce and the power of the individual states to enact regulations for their internal police are co-ordinate powers which each must respect. The states jealously guard the prerogative duty of protecting the public safety, health and morals. Courts have consistently recognized this right. Necessarily the progress of time has broadened rather than limited the construction placed upon the Commerce Clause of the Constitution. The fundamental law vitalized by the vigorous opinion of Chief Justice Marshall in Gibbons v. Ogden, 9 Wheat. 1, 6 L.Ed. 23, has been consistently adhered to and extended. In the light of intervening events any other interpretation would appear almost absurd. If progress is to continue future generations looking back upon this period must find the courts equally as farsighted and practical.

The courts with equal consistency have respected the right of the states as the proper governmental agency, to enact and enforce reasonable police regulations. Under our dual system of government both are equally necessary and must be preserved entire, but neither can be so exercised as to materially affect or encroach upon the other. State laws, not primarily aimed at commerce, but intended as legitimate exertions of the authority of the state to provide for the public safety, health and morals of the citizens of that state are not invalid because they may remotely or incidently impose restrictions on interstate commerce. Sherlock v. Alling, 93 U.S. 99, 23 L.Ed. 819.

The question whether the power of Congress to regulate interstate commerce is exclusive or whether the states have a concurrent authority, to any extent, over the same subject is the most difficult which has arisen in the construction of this clause of the Constitution. An examination of the authorities might reveal a division into four classes of guiding rules.

First the states cannot lawfully enact measures tending directly to regulate, obstruct or interfere with such commerce as is confided to the paramount control of Congress or which may be inconsistent with the legislations of Congress on the same subject. I think it is within this first class that the Minnesota Rate Cases, Simpson v. Shepard, 230 U.S. 352, 33 S.Ct. 729, 57 L.Ed. 1511, 48 L.R.A.,N.S., 1151, Ann. Cas.1916A, 18, cited by counsel for. plaintiff fall. See opinion giving many illustrations.

Second, if. the particular subject to which the power is to be directed is national in its character or is such that it can properly be regulated only by a uniform system, to such an extent that varying regulations by the individual states would cause inconvenience and be a detriment, it is not competent for the states to legislate on the subject, and if Congress does not act, its silence is to be taken as an evidence of its will that the subject shall be free from all regulation and restriction.

The rule is laid down in the case of Sligh v. Kirkwood, 237 U.S. 52, 58, 35 S. Ct. 501, 502, 59 L.Ed. 835. "That Congress has the exclusive power to regulate interstate commerce is beyond question, and when that authority is exerted by the state, even in the just exercise of the police power, it may not interfere with the supreme authority of Congress over the subject; while this is true, this court from the beginning has recognized that there may be legitimate action by the state in the matter of local regulation, which the state may take until Congress exercises its authority upon the subject. This subject has been so frequently dealt with in decisions of this court that an extended review of the authorities is unnecessary. See the Minnesota Rate Cases (Simpson v. Shepard), 230 U.S. 352, 33 S.Ct. 729, 57 L.Ed. 1511, 48 L.R.A.(N.S.), 1151 [Ann.Cas. 1916A, 18]."

The same rule of law is emphasized in the more recent case of Townsend v. Yeo-

mans, supra, in which it was said: "We find it unnecessary to pass upon the authority of the Congress to regulate the charges of the warehousemen, for we are of the opinion that, if it be assumed that Congress has that authority, it has not been exercised and in the absence of such exercise the state may impose the regulation in question for the protection of its people."

■ Third, state legislatures may regulate matters local and limited and which are most likely to be wisely provided for by such diverse rules as the authorities of the different states may deem applicable to their localities and on which Congress has not expressly legislated. Cooley v. Board of Wardens, etc., 12 How. 299, 13 L.Ed. 996; United States v. Adair, D.C., 152 F. 737.

■ Fourth, there are certain classes of state legislation which, although they may incidently or remotely affect interstate commerce, are not intended as regulations thereof, but have their primary concern for the public health, safety, and welfare of the citizens of the particular state and which are properly in the nature of police regulations. If these laws are reasonable and bona fide and there is no Act of Congress expressly covering the same ground, they are valid. And it is understood that in so far as they relate to or affect commerce Congress, by refraining from acting on the same subject, sanctions and adopts them. It is within this fourth class, if any, that the case at bar falls.

■ By the Webb-Kenyon Act, 27 U.S. C.A. § 122, passed in 1913, Congress recognized a condition which only national legislation could meet. To prevent the importation of liquor from a "wet" state into a "dry" state an adequate and complete law was enacted.

Prior to this in 1890, Congress had enacted the Wilson Act, 27 U.S.C.A. § 121.

From these enactments and the construction placed upon them by the courts it is seen that Congress has carefully considered the interstate shipment of liquor and has expressly avoided enacting legislation dealing with the shipping of liquor out of a state as is the case at bar.

Counsel for the defendants insist that this case is covered by the wording of the Webb-Kenyon Act.

This Act provides: "The shipment or transportation, in any manner or by any means whatsoever, of any spirituous, vinous, malted, fermented, or other intoxicating liquor of any kind, from one State, Territory, or District of the United States, or place noncontiguous to but subject to the jurisdiction thereof, into any other State, Territory, or District of the United States, or place noncontiguous to but subject to the jurisdiction thereof, or from any foreign country into an State, Territory, or District of the United States, or place noncontiguous to but subject to the jurisdiction thereof, which said spirituous, vinous, malted, fermented, or other intoxicating liquor is intended, by any person interested therein, to be received, possessed, sold, or in any manner used, either in the original package or otherwise, in violation of any law of such State, Territory, or District of the United States, or place noncontiguous to but subject to the jurisdiction thereof, is hereby prohibited."

The defendants insist that this language expressly gives the states a right to enact legislation pertaining to the exportation of liquor and cite as their authority the case of Commonwealth v. One Dodge Motor Truck, 326 Pa. 120, 191 A. 590, 110 A.L.R. 919.

In this case the Pennsylvania court construed the Webb-Kenyon Act as giving this right to the states in express terms. In the opinion it said [page 598]: "While the Webb-Kenyon Act was primarily aimed at the importation of intoxicating liquors into a state, in violation of the laws of that state, it also includes in express terms the interstate transportation of all liquor 'in any manner used * * * in violation of any law of such State.' 27 U.S.C.A. § 122. We have no doubt of the state's power to condemn and forfeit both the liquors so unlawfully transported and the vehicle used in such unlawful transportation."

With this construction of the Webb-Kenyon Act we cannot agree. This Act was passed in our judgment to deal wholly with importation.

It is interesting to note the history of this class of federal legislation. In 1887 the Supreme Court in the case of Bowman v. Chicago & Northwestern Railway Company, 125 U.S. 465, 8 S.Ct. 689, 1062, 31 L.Ed. 700, laid down the rule that a statute of a state, prohibiting the sale of any intoxicating liquors, except for pharmaceutical, medicinal, chemical or sacra-

mental purposes, under a license from a county court of the State, is, as applied to a sale by the importer, and in the original package or kegs, unbroken and unopened, of such liquors manufactured in and brought from another state, unconstitutional and void, as repugnant to the clause of the Constitution granting to Congress the power to regulate commerce with foreign nations and among the several states.

This was followed in 1889 in the case of Leisy v. Hardin, 135 U.S. 100, 10 S. Ct. 681, 34 L.Ed. 128.

In 1890, apparently as an outgrowth of these two decisions, Congress enacted the Wilson Act, 27 U.S.C.A. § 121, which provides as follows: "All fermented, distilled, or other intoxicating liquors or liquids transported into any State or Territory or remaining therein for use, consumption, sale or storage therein, shall upon arrival in such State or Territory be subject to the operation and effect of the laws of such State or Territory enacted in the exercise of its police powers, to the same extent and in the same manner as though such liquids or liquors had been produced in such State or Territory, and shall not be exempt therefrom by reason of being introduced therein in original packages or otherwise."

Following this was the Webb-Kenyon Act in 1913. This Act was held not to have been repealed by the National·Prohibition Act, 41 Stat. 305, nor the Eighteenth Amendment, U.S.C.A.Const. Amend. 18, under which it was enacted, in McCormick & Co. v. Brown, 286 U.S. 131, 52 S.Ct. 522, 76 L.Ed. 1017, 87 A.L.R. 448.

The Twenty-First Amendment provides in Section 2, U.S.C.A.Const. Amend. 21, § 2: "The transportation or importation into any State, Territory, or possession of the United States for delivery or use therein of intoxicating liquors, in violation of the laws thereof, is hereby prohibited."

In the light of the authorities cited, it can well be reasoned that where Congress has legislated upon importation, had this important subject before committees and under debate and deliberately failed to enact legislation dealing with exportations in interstate commerce it has thereby deliberately invited each state to make its own laws governing this particular field evidently acutely conscious of the fact that each state was better qualified to give its own citizens the character of laws which applied to the local problems.

This is a most practical matter and must be dealt with in a practical way.

Modern means of transportation are so efficient that state police powers should be broadened rather than more narrowly confined. What is a reasonable regulation today may have been an unreasonable regulation in the days of dirt roads and horse drawn vehicles.

With broad, well paved highways and high powered motor vehicles, with airplanes and open airways, by both means of which large quantities of intoxicating liquors can be transported across state lines in a short space of time, it becomes a practical impossibility to accurately check the output of plants engaged in its manufacture. It cannot therefore be said to be unreasonable to require its transportation to the state line by regularly engaged transportation services, with fixed termini and maintaining definite schedules for handling shipments of goods. While it may be suggested and has been inferred by plaintiff's counsel that this law was enacted to give some particular class engaged · in the transportation business an advantage over those of the same class as his client, this cannot be said to reflect upon the reasonableness of the regulation itself. We must presume that the legislature sought to enact a measure which it believed to be for the good of the state and its citizens, and are here called upon to pass upon the constitutionality of the legislation, not upon the motives of the majority of the members of the legislature and the Governor who signed the bill.

The cases cited by counsel for the plaintiff and relied upon by them treat principally with the general rules of interstate commerce. We think it is well for us to confine ourselves to the cases dealing with the particular product involved herein. That of alcoholic beverages. The celebrated case of Mugler v. Kansas, 123 U. S. 623, 8 S.Ct. 273, 31 L.Ed. 205, emphasizes this fact. The Supreme Court in its opinion reviewed many authorities and had this to say [page 295]: "In the License Cases, 5 How. 504 [12 L.Ed. 256], the question was, whether certain statutes of Massachusetts, Rhode Island, and New Hampshire, relating to the sale of spirituous liquors, were repugnant to the constitution of the United States. In determining that question, it became necessary to inquire whether there was any conflict between the exercise by congress of its pow-

er to regulate commerce with foreign countries, or among the several states, and the exercise by a state of what are called police powers. Although the members of the court did not fully agree as to the grounds upon which the decision should be placed, they were unanimous in holding that the statutes then under examination were not inconsistent with the constitution of the United States, or with any act of congress. Chief Justice Taney said: 'If any state deems the retail and internal traffic in ardent spirits injurious to its citizens, and calculated to produce idleness, vice, or debauchery, I see nothing in the constitution of the United States to prevent it from regulating and restraining the traffic, or from prohibiting it altogether, if it thinks proper.' "

 Here is a product which is generally recognized by its nature to be peculiarly subject to regulation under the police power. It is wholly within the territorial boundaries of the state, not yet placed in interstate commerce and must be regulated by some authority. There is no federal regulation. There is no Act of Congress prescribing the method or agency through which it may be transported over the highways or rights-of-ways within the borders of the state. The lack of national legislative control is conspicuous.

We think the language of the Supreme Court in the case of Sherlock v. Alling, 93 U.S. 99, 23 L.Ed. 819, might be applied to the case at bar. "In supposed support of this position numerous decisions of this court are cited by counsel, to the effect that the States cannot by legislation place burdens upon commerce with foreign nations or among the several States. The decisions go to that extent, and their soundness is not questioned. But, upon an examination of the cases in which they were rendered, it will be found that the legislation adjudged invalid imposed a tax upon some instrument or subject of commerce, or exacted a license fee from parties engaged in commercial pursuits, or created an impediment to the free navigation of some public waters, or prescribed conditions in accordance with which commerce in particular articles or between particular places was required to be conducted. In all the cases the legislation condemned operated directly upon commerce, either by way of tax upon its business, license upon its pursuit in particular channels, or conditions for carrying it on." [Page 102.]

Further on in the opinion the Court said: "But with reference to a great variety of matters touching the rights and liabilities of persons engaged in commerce, either as owners or navigators of vessels, the laws of Congress are silent, and the laws of the State govern. The rules for the acquisition of property by persons engaged in navigation, and for its transfer and descent, are, with some exceptions, those prescribed by the State to which the vessels belong; and it may be said, generally, that the legislation of a State, not directed against commerce or any of its regulations, but relating to the rights, duties, and liabilities of citizens, and only indirectly and remotely affecting the operations of commerce, is of obligatory force upon citizens within its territorial jurisdiction, whether on land or water, or engaged in commerce, foreign or inter-State, or in any other pursuit."

"That the regulation of the manufacture and sale of intoxicating liquors is a proper subject for the exercise of the police power, is a proposition which has never been doubted. On all grounds which are recognized as most safely and surely bringing a matter within the scope of this power, the production and selling of intoxicants is included within the sphere of its legitimate operations. Whatever form, therefore, the regulating or restricting law may assume, if it is not in contravention of some constitutional provision, it is to be sustained as valid on this ground. This has been the decision in regard to laws totally prohibiting the manufacture and sale of liquors, laws allowing such prohibition to particular parts of the state at their option, laws licensing the traffic in liquors, regulating or prohibiting the sale on certain days or in certain places or to particular classes of persons, authorizing the search for and seizure of liquors illegally kept for sale, imposing special or punitive taxation upon the business, and laws giving a right of action in damages to persons injured as a consequence of particular sales against the persons making such sales." Black's Constitutional Law, Third Series, p. 402.

Since intoxicating liquor is universally recognized as a legitimate subject over which the states may exercise their police power, even to the extent of denying the right to manufacture, it cannot be consistently held that they may permit it to be manufactured, but then lose complete control of what is done with it.

If the state can arbitrarily grant or withhold the right to manufacture liquor on the theory that the nature of the product was something that authorized strong regulation, then that regulation should certainly continue so long as the admittedly dangerous element is within the borders of the state. It does not lose its dangerous element by being merely labeled for exportation to a foreign state or country, even though it might incidently interfere with interstate commerce.

It is an absurdity to say that Kentucky can control its liquor output but cannot control its distribution. The reason for one applies with triple force to the other. There are hundreds of independent trucks operating in Kentucky under a contract carrier's license. They have no schedule, no fixed route, and no definite termini. It would be an impossibility to determine the quantity or destination, whether within or without the State of Kentucky, if distillers could call a passing truckman and make a private contract for hauling each load of liquor. Assuming that liquor, uncontrolled, is a dangerous element to the health, morals and welfare of the citizens of Kentucky, there appears no greater means by which Kentucky could mistreat her citizens than to permit the manufacture and sale of liquor but have nothing to say about its handling while within the borders of the state.

The Pennsylvania Supreme Court, in the case of Commonwealth v. One Dodge Motor Truck, supra, in this connection said: "The foregoing decisions leave no doubt that the Commonwealth of Pennsylvania has the power to prohibit the manufacture of alcoholic liquors within its borders. And this is so, even though such liquors are intended only for shipment out of the state. Kidd v. Pearson, 128 U.S. 1, 9 S.Ct. 6, 32 L.Ed. 346. The power to prohibit absolutely includes the power to prohibit conditionally, or to impose reasonable regulations or conditions on such manufacture. Eberle v. Michigan, 232 U.

S. 700, 34 S.Ct. 464, 58 L.Ed. 803; Com. v. Vigliotti, 271 Pa. 10, 115 A. 20, affirmed Vigliotti v. Pennsylvania, 258 U.S. 403, 42 S.Ct. 330, 66 L.Ed. 686; Com. v. Stofchek, supra [118 Pa.Super. 412, 180 A. 84, affirmed 322 Pa. 513, 185 A. 840]. 'The greater power includes the less.' Seaboard Air Line Ry. v. North Carolina, supra [245 U.S. 298, 38 S.Ct. 96, 62 L. Ed. 299]. It is common knowledge that the successful administration of statutes prohibiting or regulating the traffic in intoxicating liquors depends on the ability of the state to enforce them; and the state's success in enforcing such laws is in direct proportion to its ability to control the transportation and delivery of the liquors. The state will have comparatively little trouble in enforcing its statutes prohibiting the manufacture, sale, and possession of illegal or bootleg liquors, if it can control their transportation and delivery; and the transportation and delivery by automobiles, motortrucks, and motor vehicles constitute the greatest difficulty. This was recognized by the Supreme Court of the United States in United States v. Simpson, supra, where the opinion writer, Mr. Justice Van Devanter, said, speaking of the 'Reed Amendment,' supra: 'Had Congress intended to confine it to transportation by railroads and other common carriers it well may be assumed that other words appropriate to the expression of that intention would have been used. And it also may be assumed that Congress foresaw that if the statute were thus confined it could be so readily and extensively evaded by the use of automobiles, autotrucks and other private vehicles that it would not be of much practical benefit.' 252 U.S. 465, at page 467, 40 S.Ct. 364, 64 L.Ed. 665, 10 A.L.R. 510."

We are of the opinion that this is a valid and reasonable regulation under the police power and does not contravene the Commerce, Due Process or Equal Protection Clauses of the Federal Constitution.

The action should be dismissed.