NICHOLAS LATZONI AND MIRIAM TEICH, PLAINTIFFS-RESPONDENTS, v. CITY OF GARFIELD, A MUNICIPAL CORPORATION, D. STAMATO AND COMPANY, INC., A BODY CORPORATE, AND NEW YORK, SUSQUEHANNA AND WESTERN RAILROAD COMPANY, INC., LIKEWISE A BODY CORPORATE, DEFENDANTS-APPELLANTS.

JOSEPH H. MILLER, PLAINTIFF-RESPONDENT, v. CITY OF GARFIELD, ET AL., DEFENDANTS-APPELLANTS.

Argued May 14, 1956—Decided June 25, 1956.

*Mr. Ervan F. Kushner* argued the cause for the appellant City of Garfield (*Mr. Robert Kleiner,* on the brief; *Mr. Theodore R. Ciesla,* attorney).

*Mr. William T. Wachenfeld* argued the cause for the appellant New York, Susquehanna and Western Railroad Company, Inc. (*Messrs. Lum, Fairlie & Foster,* attorneys).

*Mr. Abram Simon* argued the cause for the respondents (*Mr. Aaron Dines,* on the brief; *Mr. Louis Steisel,* attorney for the respondent Joseph H. Miller; *Mr. Joseph Teich,* attorney for the respondents Nicholas Latzoni and Miriam Teich).

The opinion of the court was delivered by

HEHER, J.   These are actions in tort for "active wrongdoing" laid to the City of Garfield and for the allegedly concurring negligence of the New York, Susquehanna and Western Railroad Company, Inc. and D. Stamato and Company, Inc. in relation to the use of "the public way" known as Division Avenue, in Garfield, "adjacent to and over the tracks, right of way and grade crossing of the defendant" railroad, "thus bringing about a dangerous and unsafe condition in the public way," whereby the plaintiffs all suffered

personal injury and Latzoni property damage as well when, on November 23, 1952, Latzoni's automobile in which his co-plaintiffs were passengers "came in contact with a broken and uneven portion of the roadway and right of way."

The issues were tried to a jury; and there was a verdict for all three plaintiffs against the city and the railroad, who appeal asserting they were entitled to a directed judgment as a matter of law, and there was error also in the denial of their respective motions to that end, at the close of the plaintiffs' case and renewed at the close of the whole case. A like motion by Stamato at the conclusion of the plaintiffs' case was granted; and there is no appeal from the consequent judgment in its favor.

The appeals are here by certification on our own motion.

This is the situation of fact: The railroad line, running north and south, was established in 1865 on a 66-foot right of way. Division Avenue was dedicated in 1907. It was originally a dirt road extending east and west on both sides of the railroad right of way, "ending," it is said, on either side of the railroad, and there was thereafter "no crossing either constructed, permitted or used by motor vehicles," connecting the separated sections of the highway. The railroad says that Division Avenue, "as nearly as can be determined, did not exist until shortly prior to 1918, when for the first time it appears on certain evaluation maps which were prepared in conjunction with the Interstate Commerce Commission," then appearing "on both sides" of the railroad right of way, "but there is no indication on any official records that Division Avenue has been dedicated across the right of way of the railroad and in fact it never has been dedicated and is not now a crossing"; "the City has no claim to the railroad property lying between the extremities of Division Avenue; the City property stops at the right of way; Division Avenue had been only a dirt road until the improvement in 1952."

But developments preceding the mishap raise the question of a civil injury or wrong remediable by an action in tort for compensatory damages.

There was a gradual community growth until in 1952 Division Avenue had 20 buildings west of the railroad tracks and seven buildings to the east, comprising dwelling houses, apartment houses, a church and factories. Parallel to the tracks, 750 feet to the west, Ray Street intersects Division Avenue. For some time prior to 1952, the city maintained a "dead end sign" at this street intersection. The city says that "Notwithstanding the fact that Division Avenue was improved only to the extent of 'an oil coating,' it was a well lighted dead end street"; there was "an arc light at the intersection of Division Avenue and Ray Street, 750 feet back from the railroad track, a 60 watt light 200 feet before the railroad track and another arc light 100 feet beyond the railroad track"; "The dead end sign was placed with reference to the termination of Division Avenue at the railroad track," and "Another dead end sign was similarly erected on Division Avenue on the easterly side of the railroad track"; "The railroad track was actually 'a little used siding' of the railroad company, known as the Passaic Branch," and "The tracks are seven to eight inches above ground level."

Sometime in September 1951 the Mayor and Council of Garfield adopted a resolution authorizing the "improvement" of Division Avenue between Ray Street and Prospect Street, including a "crossing" of the railroad's right of way and the construction of "two new catch basins" along the easterly line of the right of way at Division Avenue, "connected to a storm drain presently in place along the easterly line of the right of way," and "two new catch basins and storm drains at the intersection of Division Avenue" and the "railroad right of way"; and the railroad was notified accordingly on September 26, 1951. Therein, the city made known its intention to apply forthwith to the Board of Public Utility Commissioners for appropriate action; and the railroad's "approval" and cooperation were solicited. The railroad concedes that negotiations were begun immediately to "settle certain differences as to whether the city or the

railroad would incur certain costs in the construction of the crossing." The city says that, unknown to it at the time, the railroad had leased to another land on the easterly side of its right of way. The railroad's contention at the trial was, "There cannot be a right of way across our property because it is leased to this coal company"; "* * * the public had no right of way to cross the property; it was our property; we leased it to a specific individual company for a particular purpose." But in a letter dated October 16, 1951, the railroad's general manager advised the city it would interpose no objection to a grade crossing if the city would assume all costs and expense of crossing construction, including track changes and sidewalks, automatic highway warning signals to be connected with track circuits. The city demurred to the demand for "automatic warning signals" at its expense; and another review of the matter was suggested. Renewed negotiations were fruitless; and the Utility Commission's formal approval of the plan to construct the crossing did not come until June 16, 1954. It was conditioned upon the installation of "Standard advance warnings and standard wooden cross buck signs; they would be put there when and if the railroad and the City got together on that agreement." This, from the railroad's witness Marvin, who explained, "The Railroad objected to the crossing," suggesting that for that reason an agreement was out of the question.

Meanwhile, in May 1952, the city awarded to Stamato a contract to macadamize Division Avenue to the track siding on either side; and the work was completed sometime before the mishap, but not formally approved and accepted by the city until later.

All this, with the knowledge of the railroad, the jury could well have found, as it undoubtedly did find, and without recognition by the railroad of a duty to erect barricades and give warning, either or both, of the danger to travelers on Division Avenue ensuing from the substantially altered condition of the *locus,* due to the reasonably mistaken traveler assumption, the jury could also have found, that

Division Avenue, in the new construction, continued across the railroad right of way.

The railroad maintains that "During the course of these negotiations," and "without further notice" to it, in April or May 1952, the Stamato contract was made; that it did not require the contractor "after completion of the physical aspects of the roadway, to put up barricades, barriers or signs of any kind as a warning of its termination to those traveling the road," and the railroad "was not notified or consulted with regard to the terms and conditions of the contract," and "In accordance with the contract, there were no barriers, barricades or signs of any kind erected at the termination of the roadway when the contractor completed its work of improving the roadway"; and that "After the completion of the improvements, the defendant's railroad tracks and the 66-foot right of way" lay between the two dead end sections of Division Avenue as it had been improved, the tracks extending "upwards about seven or eight inches above the level of the right of way," and "it was impossible for an automobile to safely cross the right of way because of the protruding railroad tracks": all this, plus the lease adverted to *supra,* proving "there was no crossing at this point."

■ But the argument begs the question. It predicates active wrongdoing or negligence by the city, yet the very condition thus affirmed as a danger shaped by the city was known to the railroad, or the jury could have so found, as it presumably did find, a highway trap for want of barricades, adequate lighting and warning to the unknowing and unsuspecting traveler misled by the semblance of a continuous roadway crossing the railroad's right of way; and it was for the jury to say whether the railroad, knowing of the altered character of the highway in relation to the rail intersection, had in the particular circumstances transgressed a duty of reasonable care for the traveler's safety from the same hazard, even though created by the city, a crossing in all outward seeming to a traveler exercising reasonable care in the use of the highway.

■ Counsel for the railroad says, "This is not a question of railroad law but rather a question of liability and duty on behalf of any property owner whose lands abut public streets." But the analogy is not altogether apt. While transportation by rail serves the essential public interest, and is regulable as such, *Van Riper, State by, v. Traffic Telephone Workers' Federation of New Jersey*, 2 *N. J.* 335 (1949), it is yet an operation for private profit; and the operator of the facility is under a duty of reasonable care to the traveling public in relation to crossing intersections, consistent with the nature and essential requirements of the service and state regulation to that end; and this without regard to whether the highway was duly established under the law.

■ By statute, *R. S.* 48:12–49, the railroad is enjoined to "construct and keep in repair good and sufficient bridges and passages over, under and across the railroad or right of way where any road, street or avenue now or hereafter laid, shall cross the same, so that public travel on the road is not impeded thereby," such bridges and passages to be of a width and character "suitable to the locality," provided that there shall be no enlargement of the duty imposed by the charter of a railroad company organized by special act and whose railroad was constructed prior to April 2, 1873. See *New Jersey Highway Authority v. Central Railroad Co.*, 21 *N. J.* 157 (1956). The duty was originally enforceable in equity at the instance of the municipality; but a new highway crossing at grade cannot be constructed "without first obtaining permission" from the Utility Commission. *R. S.* 48:12–52; *R. S.* 48:2–28. See *Borough of Metuchen v. Pennsylvania Railroad Co.*, 73 *N. J. Eq.* 359 (*E. & A.* 1908); *Town of Harrison v. United N. J. R. & Canal Co.*, 101 *N. J. Eq.* 427 (*Ch.* 1927), affirmed 103 *N. J. Eq.* 372 (*E. & A.* 1928); *Central R. Co. of New Jersey v. Board of Public Utility Commissioners*, 112 *N. J. L.* 215 (*Sup. Ct.* 1934), affirmed *sub nom. State Highway Commission v. Board of Public Utility Commissioners*, 114 *N. J. L.* 398

(*E. & A.* 1935); *Pennsylvania-Reading Seashore Lines v. Board of Public Utility Commissioners,* 13 *N. J. Super.* 540 (*App. Div.* 1951), affirmed 8 *N. J.* 85 (1951).

Yet, quite apart from the status and obligations of the parties *inter se* pending the approval proceeding before the Utility Commission, the question is whether in the particular circumstances the duty of reasonable care was a natural concomitant of the railroad's relation to the traveling public; and here this presented an issue for the jury. Was the hazard known to the railroad and, if so, was there not a failure of duty involving an unreasonably great risk to highway travelers, such as fell short of the measure of duty established by law for the protection of others against such risks of harm? *Harpell v. Public Service Coordinated Transport,* 20 *N. J.* 309 (1956). As there said, citing *Prosser, Law of Torts* (2d ed.), 119, 147, 188 for the principle now receiving general acceptance, negligence is a matter of risk, that is to say, of "recognizable danger of injury." It cannot be that the railroad, even though knowing of the hazard to the traveling public attending the fulfillment of its franchise for the public service, to its own private gain, was not under the duty of care to avert the danger. It was on the plainest principles of justice and sound social policy laden with an obligation of care commensurate with the known or reasonably foreseeable risk of harm. The road construction proceeded to completion, but the controversy continued as to the economic burden of constructing and maintaining the crossing and the signal mechanism, and so also the danger to the public.

The ruling principle is basic to the law of land use. The use and enjoyment of lands is necessarily controlled by the essential correlative rights of others and the requirements of public safety, according to the maxim of the common law, "so use your own property as not unreasonably to injure another." The duty of care arises out of the known or reasonably foreseeable unreasonable risks to others. A negligent act of misfeasance may be actionable. *Salmond on the Law of Torts* (10th ed.), 469 *et seq.*

■ In treating of the liability of possessors to persons outside the land, the *Restatement, Torts, section* 367, sponsors the rule, in all seeming fundamental, that a possessor of land "who so maintains a part thereof that he knows or should know that others will reasonably believe it to be a public highway," is liable for bodily harm caused to them while using such part as a highway, "by his failure to exercise reasonable care to maintain it in a reasonably safe condition for travel." In such circumstances, *Comment a,* one whom a possessor of land intentionally or negligently misleads into believing that part of his land is a public highway, "is entitled to expect that the possessor will afford him a security similar to that which he would be entitled to expect were the land actually a highway." Compare *Daneck v. Pennsylvania R. Co.,* 59 *N. J. L.* 415 (*E. & A.* 1896); also *Restatement, Torts, sections* 364, 368.

In somewhat similar circumstances, *West Jersey & Seashore R. Co. v. City of Millville,* 93 *N. J. Eq.* 226 (*E. & A.* 1921), Vice-Chancellor Leaming, affirmed by the Court of Errors and Appeals, granted a restraint against interference with the erection of crossing barriers by the railroad where there was "an existing menace to the public that will continue until the public utility commission shall act in authorizing this crossing to be built," created by the "grading and surfacing" of the street by the city "up to the tracks" of the railroad. There was controversy as to whether it was the duty of the city to apply to the Utility Commission for leave to extend the highway across the tracks, or the railroad's, to build the crossing. The holding was that the burden was the city's. The vice-chancellor said: "By the highway I refer to a completed highway across the tracks; it is not completed at this time across the tracks. It may be a legal street but it is not usable—it is not passable." The railroad there recognized and undertook performance of what it conceived to be its duty in the circumstances.

■ In a New Jersey case, Chief Justice Taft referred to a railroad's duty of "reasonable precaution to avoid danger to the public." *Lehigh Valley R. Co. v. Board of Public*

*Utility Commissioners,* 278 *U. S.* 24, 49 *S. Ct.* 69, 73 *L. Ed.*
161 (1928). See *In re Central Railroad Co.,* 30 *N. J. Super.*
520 (*App. Div.* 1954). In a case such as this, it is the
existence of the crossing hazard, rather than the cause, that
gives rise to the correlative burden of care in keeping with
the risk. Compare *Eckert v. Perth Amboy & Woodbridge
R. Co.,* 66 *N. J. Eq.* 437 (*Ch.* 1903). The obligation has
its origin in the common law. *Wagner v. Toledo, P. & W.
R. R.,* 352 *Ill.* 85, 185 *N. E.* 236 (*Sup. Ct.* 1933).

The duty of care here has special reference to highway
travel in the half-light or darkness of night. The time of
the mishap was 5 A. M., when plaintiffs' automobile, pro-
ceeding east on Division Avenue as if the highway continued
over the railroad right of way, came in contact with the
rails.

It is a corollarial consequence of these considerations
that there was active wrongdoing imputable to the city
within the principle of *Allas v. Borough of Rumson,* 115
*N. J. L.* 593 (*E. & A.* 1935). In factual incidence, the
cases are much the same, that is to say, there was an affirma-
tive act rendering the place one of danger to human safety,
and so positive misfeasance.

Affirmed.

*For affirmance*—Justices HEHER, JACOBS and BRENNAN—
3.

*For affirmance as to railroad and reversal as to city*—Chief
Justice VANDERBILT—1.

*For reversal in toto*—Justice OLIPHANT—1.