42 N.J. Super. 247 (1956)
126 A.2d 224
EVA F. HARTMAN, ADMINISTRATRIX AD PROSEQUENDUM AND EVA F. HARTMAN, ADMINISTRATRIX OF THE ESTATE OF HARRY HARTMAN, DECEASED, PLAINTIFF-APPELLANT,
v.
CITY OF BRIGANTINE AND COUNTY OF ATLANTIC, DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued October 8, 1956.
Decided October 25, 1956.
*250 Before Judges GOLDMANN, FREUND and CONFORD.
*251 Mr. Josiah E. Dubois, Jr., argued the cause for plaintiff-appellant (Messrs. Josiah E. DuBois, Jr. and Madison S. DuBois, attorneys).
Mr. Herbert Horn argued the cause for defendant-respondent City of Brigantine (Messrs. Lloyd, Horn, Megargee & Steedle, attorneys).
Mr. Harry Miller argued the cause for defendant-respondent County of Atlantic.
The opinion of the court was delivered by CONFORD, J.A.D.
This is an action to recover damages for the death of plaintiff's intestate, her husband, allegedly caused by the negligent misfeasance and creation or maintenance of a nuisance by the defendant municipalities at the easterly or bulkheaded end of Brigantine Avenue in the City of Brigantine, Atlantic County. The case sought to be projected by the plaintiff was that the decedent was driving his car, alone, on the night of September 24-25, 1954, on Brigantine Avenue, northeasterly of its intersection with 14th Street, and that there was no observable indication that the street dead-ended at a bulkhead erected in 1938 by the county, being some 150 feet beyond 14th Street and two to three feet above the street level, because the bulkhead was hidden from view by a large number of piles of mixed dirt, gravel and broken black-top piled there previously by the county; that the city had control and responsibility for the maintenance of the street, knew of the obstructing piles and failed to place warning signs or lights for the protection of travellers; and that the decedent's car went through the piles and over the bulkhead because of the allegedly dangerous condition thus created and landed on the beach, at a level eight feet below the top of the bulkhead, causing him to sustain injuries from which he succumbed several days later.
At the trial in the Law Division there was an involuntary dismissal at the end of the plaintiff's case: in favor of the *252 defendant county because there was no evidence that the dumping of the piles or mounds was authorized by the county or that the county participated in it; in favor of the defendant city because it had nothing to do with the placing of the dirt and because its default, if any could be imputed to it on the basis of the knowledge by its agents of the condition, amounted to no more than nonfeasance in the discharge of a public duty, for which a municipality is not liable. From the consequent judgment plaintiff appeals.
The basic facts in the case are these: Brigantine Avenue begins as a paved county highway at the southerly end of Brigantine and runs two and one half miles along the oceanfront under county control until it reaches 14th Street. Thence it continues as a gravel road 150 feet until it comes upon the bulkhead already mentioned. The last street light is at the intersection of Brigantine Avenue and 14th Street. The gravel road is under the control of the City of Brigantine. The bulkhead was built by the county as a device to prevent erosion of the land by the ocean. Prior to its construction the land was eroded to a point about 50 feet southwesterly, or landward of the present location of the bulkhead. At that time there was only a one-car lane northeast of 14th Street and over a period of years thereafter the street was widened to its present width of some 80 feet as a result of filling with waste materials by both the county and the city from time to time. The process of widening had been completed only recently but the road had not been in good condition for any extended period of time, particularly near the bulkhead itself, as storms created periodic washouts, leaving holes or depressions. Whenever this happened the county or the city road departments, sometimes both, would, sooner or later, dump fill and either grade or level it.
One such washout created a hole or depression near the bulkhead in the spring of 1954. The Brigantine city clerk phoned the county engineer and asked for county assistance in filling it. The testimony of the engineer implied that there previously had been like conversations, the one in question being described as "the last occasion." He said he told *253 the clerk he did not know if the county could do it and suggested it be done by the city. In any event, a county curb construction project on the portion of Brigantine Avenue controlled by the county got under way the early or middle part of September 1954, and quantities of dirt, gravel and broken black-top were daily dumped, by direction of the county assistant road supervisor, in the low area at the end of Brigantine Avenue, and, according to that official, about 25 or 30 feet from the bulkhead. He volunteered in his deposition that:
"We are not supposed to do it. We just done it because it was a good place to get rid of the stuff, and it was excess stuff * * *."
On cross-examination he said:
"Q. But you had no instructions or authority from the county to put it there? A. No sir, I put it there because it was dangerous and that is a bad spot there and there was no sign up there."
He also said "we had no other place" to dump. After the dumping of the piles there was some grading of the material, but on September 25, the morning of the accident, there remained what appeared to a police officer, O'Connor, to be some 25 to 50 mounds, closely grouped so as to appear as hills and valleys, three to four feet high, extending over a width of about 50 feet and lying in a zone from about 20 feet to about 40 feet from the bulkhead.
O'Connor testified that he was notified by radio at 6:30 A.M. on September 25, 1954 that there was a car on the beach. He found the car facing the ocean, with its front bumper about 29 feet from the bulkhead. Its front doors could not be opened. Decedent was unconscious and there was an odor of alcohol about him. O'Connor found a "set of tire tracks" leading to one of the mounds of dirt on Brigantine Avenue, about 42 feet from the bulkhead. The mound was about seven feet wide. It was "all broken up" and "the top of it was taken off." In line with the tracks, the mound, and the position of the car on the beach O'Connor saw what he described as a "tire smudge mark" on top of *254 the bulkhead. He saw no tire marks on the ground between the mound and the bulkhead. A physics professor testified for plaintiff that an object of any weight projected through the air from the mound at the angle of elevation indicated by the width and height of the mound would, in order to reach the point on the beach where the car was found, be taking off from the mound at 29.4 miles per hour. It is obvious, however, that this affords no evidence as to how much faster the decedent's car may have been travelling prior to its supposed impact with the mound, nor that the car was in fact airborne from the mound to the top of the bulkhead.

I.
A preliminary question is presented by the contention of the county that counties are not liable at all under the wrongful death act, N.J.S. 2A:31-1 to 6. The argument is that whereas the act as originally adopted in 1848 (L. 1848, p. 151) referred to tort-feasors responsible under the act as "the person who, or the corporation which, would have been liable if death had not ensued," etc., both the Revision of 1937, in section 2:47-1, and the revision of Title 2 by L. 1951, c. 344, in section N.J.S. 2A:31-1, delete the reference to "the corporation" in the verbiage corresponding to the phrase quoted above from the original act; that the term "corporation" in the original act was not defined and was interpreted in Murphy v. Board of Chosen Freeholders, 57 N.J.L. 245 (Sup. Ct. 1894) to include public corporations such as counties; but that the definition of the term, "person," in R.S. 1:1-2, while including "corporations, companies, associations, societies, firms, partnerships and joint stock companies as well as individuals," omits any reference to municipal corporations, and that from this it may be deduced that counties are not "persons" within the declaration of liability for wrongful death in the death act.
We are not persuaded. After all, counties are municipal corporations, being expressly declared to be bodies *255 corporate by the Revised Statutes (40:18-1), and there is no reason why the definition of "person" in the Revised Statutes as including "corporations," undifferentiated as between commercial and public corporations, should be held to mean only the former and thereby effect the substantial change from the prior liability of public corporations for wrongful death announced in the Murphy case, supra, to total immunity. As has frequently been stated with respect to the Revised Statutes of 1937, "There is a presumption against a legislative intent to effect a change in substance by a revision of the general laws. Mere changes in phraseology, and even the omission of words, do not of necessity overcome the presumption. The intention to effect a change in substance must be expressed in language excluding a reasonable doubt." Murphy v. Zink, 136 N.J.L. 235, 244 (Sup. Ct. 1947), affirmed 136 N.J.L. 635 (E. & A. 1948). The legislative intention is sometimes gathered with greater acuity "from the spirit and policy of the statute rather than the literal sense of particular terms." Lloyd v. Vermeulen, 22 N.J. 200 (1956). The death act is remedial and should be construed so as to give liberal scope to its beneficent purpose. Carianni v. Schwenker, 38 N.J. Super. 350, 361 (App. Div. 1955). We find nothing in the argument of the county which would warrant the extremity of a conclusion that the 1937 legislative revisers intended to give municipal corporations surcease from their previous liability for wrongful death, and the contrary was apparently assumed in Truhlar v. Borough of East Paterson, 4 N.J. 490 (1950), sub silentio. See also Cloyes v. Delaware Township, 41 N.J. Super. 27 (App. Div. 1956).

II.
The county urges affirmance on the additional ground that, as held by the Law Division, the dumping of fill by its agents was not authorized by resolution or otherwise and was done in a place to which the jurisdiction of the county did not extend. It has never been held or intimated in any of the decided cases that a resolution of the governing *256 body of the municipality authorizing the particular work or activity is a prerequisite to municipal liability for active wrongdoing or nuisance, and the suggestion is so incongruous with the everyday manner of functioning of local government that it might well be dismissed out of hand. For purposes of tort liability it is generally sufficient that the municipal agents or employees are acting within the scope of their general duties, even if they are proceeding in an irregular manner or contrary to law. 18 McQuillin, Municipal Corporations (3rd ed. 1950), § 53.69, p. 329. We are not here confronted with a question of criminal responsibility, Township of Lodi v. State, 53 N.J.L. 259 (Sup. Ct. 1891), or of liability on contract, Giardini v. Town of Dover, 101 N.J.L. 444 (Sup. Ct. 1925); Campbell v. City of Hackensack, 115 N.J.L. 209 (E. & A. 1935).
So far as the question raised may involve the matter of the rank in the line of municipal authority of the officer in charge of the work, Kelley v. Curtiss, 29 N.J. Super. 291, 298, 299 (App. Div. 1954), reversed on another point in 16 N.J. 265 (1954), so as to establish participation by the county in the activity, plaintiff has no problem, as the dumping of the mounds was by direction of an agent, the assistant road supervisor, having general authority over the entire job including disposition of the dirt, etc., from the excavation, ibid. In Valentine v. City of Englewood, 76 N.J.L. 509, 512 (E. & A. 1908), cited by the county, it was held that a city is not responsible for the actions of the local board of health acting under statutory mandate, the governmental agencies being distinct. The case is not in point.
There are several reasons why we have no difficulty with the circumstance that these mounds were dumped on a street to which the obligation of the county to repair or maintain did not extend. First, the county had by formal action authorized the construction of the bulkhead, apparently within a broad construction of the statutory authority granted by R.S. 27:16-1(e) to build bulkheads to protect any road or highway under control of the county (taken as in reference *257 to Brigantine Avenue south of 14th Street). And the evidence in the case is that over a considerable period of time, long enough to have imputed notice to the governing body, Kress v. City of Newark, 8 N.J. 562, 574 (1952), county agents were from time to time filling in washouts on the street side of the bulkhead and generally widening the street by filling in north of 14th Street, activities apparently motivated partly by a feeling of responsibility for conditions in and about the bulkhead (which, incidentally, was authorized to be extended by resolution of the board of freeholders in 1951), and possibly also by the fact that the stretch of road north of 14th Street is, in effect, the terminal of the county-maintained Brigantine Avenue as an entirety. In this connection it is to be noted that R.S. 27-16-34 provides that "If a dangerous place exists in or near a county road the board of chosen freeholders shall erect and maintain, in or near such road, proper fences, warning signs and other safeguards for the protection of travelers using the road." It would not be an unreasonably precautious view of their responsibilities in respect to the road south of 14th Street, under the statute, for the county authorities to conclude that any holes or depressions in the natural continuation of that road from 14th Street to the bulkhead should be repaired by them, even though such repairs might not be their strict obligation as a matter of territorial jurisdiction. Indeed, the county assistant road supervisor, as noted, expressly stated as one reason for his dumping the materials into the hole that the condition was dangerous.
We need not consider the additional colorable thesis for liability consisting in the failure, as against the statutory duty of the county to warn travellers of dangers "near" the county road, to give warning of the known danger constituted by the bulkhead dead-end hidden by the piled-up mounds.
Finally, we are satisfied that the plenary authority vested in the assistant road supervisor to handle the curb project included such discretion as to the disposal of the material excavated as implicates the county in tort for the resulting *258 nuisance or dangerous condition. The county engineer testified that the assistant road supervisor "had a free hand with these materials" and the latter testified he had "no other place" to dispose of them. The disposition of the materials was an obviously necessary incident of the curb job and presumably for the benefit of the county. We have no doubt that if what happened here was wrongdoing, it was the county's "own by direction or participation" for this reason, as well as on account of the long history of similar undertakings by county agents in the past. Milstrey v. City of Hackensack, 6 N.J. 400, 408 (1951); cf. Casale v. The Housing Authority of the City of Newark, 42 N.J. Super. 52 (App. Div. 1956).

III.
We proceed to a consideration of the argument by the City of Brigantine that the evidence does not justify a conclusion that anything which the city did involves the "active" ingredient which would constitute its conduct such "active wrongdoing" as is a requisite for municipal tort liability in the performance of a public duty. Allas v. Borough of Rumson, 115 N.J.L. 593, 595 (E. & A. 1935). The basic theme of the contention is that the present action is grounded upon the placing of the mounds in the street, and that since the city had no part in this its failure to post signs or barriers or to provide lights is mere passive negligence or nonfeasance. To this there are several responses:
(1) The city may be deemed to have adopted the dumping of the materials as its own activity. It has already been seen that the previous dumpings into and fillings of street holes and depressions by the county and city were, whether by agreement or not, in effect the tacit joint prosecution by both agencies of a program of ameliorative street treatment which subserved the city's duty to keep the street near the bulkhead in passable condition. The jury could find from the testimony of the county engineer that the city had on previous occasions asked the county to dump fill there, the most recent occasion being in May or June 1954. *259 Three weeks prior to the accident there was a dangerous hole needing filling, and the city street foreman testified he intended to fill it in. He admitted he knew at least three days prior to the accident that the materials had been deposited there by the county and nothing was done about it by the city. It is inferable from the evidence that the city knew of the presence of the piles considerably earlier, as the street foreman patrolled the area every other day. Despite the piling and partial grading of the materials there was still a depressed area requiring filling. The city street foreman himself had done some filling at that point that spring and it was part of his general duties to fill in washouts whenever they occurred. As this part of Brigantine Avenue was the maintenance responsibility of the city we are of the opinion that the evidence could have warranted a jury finding that the city accepted the dumping by the county as for its benefit and thus became chargeable with the "active" element of that action.
(2) It is not required that all of the causative links in the chain of relationship between the municipality and the accident to the injured party be comprised of affirmative acts in order for the result to be classifiable as affirmative wrongdoing. Kelley v. Curtiss, supra (29 N.J. Super., at page 297). One affirmative act in the sequence suffices. Ibid. Many, for example, are the instances of the classic situation where, as here, the placement of an object or obstruction in a street is one element and the failure to guard and give warning of it to travellers the other in the chain of inculpatory conduct. See the collection of such cases in Messier v. City of Clifton, 24 N.J. Super. 133, 139 (App. Div. 1952). It is implicit in Latzoni v. City of Garfield, 22 N.J. 84 (1956), that the obstructive and dangerous instrumentality in that kind of hazard-complex need not be the creation of the municipality held for active wrongdoing.
In the Latzoni case a municipality had paved a street leading to a railroad right-of-way in such a manner that an unwarned traveller by car "in the half-light or darkness of night" (22 N.J., at page 94) would get the impression *260 that he could safely cross the railroad tracks. Actually, however, there was no safe crossing, the tracks being raised, and the plaintiff was permitted to recover for injuries sustained in trying to cross the tracks against both the municipality and the railroad company, the liability of the former being postulated upon "an affirmative act rendering the place one of danger to human safety, and so positive misfeasance" (22 N.J., at page 94). It is to be noted that the municipality had nothing to do with the tracks where the plaintiff came to grief, its only action being the construction and maintenance of the approach street. In principle the present situation is not distinguishable. The City of Brigantine had constructed and was maintaining, as of the date of the accident, a highway which ended, without advance warning or lighting, at a bulkhead two to three feet high. The jury could have found from the evidence that for two or three weeks prior to the accident the bulkhead was, to the knowledge of the city, hidden from the view of night travellers by car on the road by irregular mounds of a color similar to the gravel roadway which might create a fleeting impression of an indefinite continuation of the roadway to such motorists not familiar with the area. The participation by Brigantine in this dangerous situation, once it knew of the mounds, was as much in the nature of affirmative action as the conduct attributable to the City of Garfield in the Latzoni case.
(3) The mounds or piles were, under the circumstances, an obstruction and a dangerous condition on a public highway tantamount to a public nuisance. Milstrey v. Hackensack, supra (6 N.J., at page 400). Even though the city were not responsible for their presence in the first instance, the leaving of them there after notice on a public thoroughfare committed to the care and maintenance of the city could have been found by the jury to be a continuance of the active wrongdoing and nuisance inhering in the original placement and a participation therein by the city. Kress v. City of Newark, supra (8 N.J., at page 574); Kelley v. Curtiss, supra (29 N.J. Super., at p. 298).

*261 IV.
The defendants next raise the question that there was insufficient proof to go to the jury to warrant a finding of proximate cause between the condition of the street and plaintiff's misfortune. The argument merges into a contention that there was contributory negligence by the decedent as a matter of law. Defendants do not contend that there is no proof of causal relationship between the presence of the mounds and the ultimate accidental fall of the car over the bulkhead. They argue that the circumstances compel a conclusion of carelessness on the part of the decedent in the form of excessive speed when approaching the street end and of failure to take heed of the mounds and slow down, or otherwise, and that such negligence intervened between any wrongdoing by defendants and the accident so as to break the chain of causation. But in that sense the defense is really contributory negligence rather than lack of proximate cause, and it will be considered in that sense presently.
So far as degree of causal relationship is concerned, in respect of other concurrently contributing causes, "our law attaches liability not only to the dominating cause, but also to any cause which constitutes at any event a substantial factor in bringing about the injury," Melone v. Jersey Central Power & Light Co., 30 N.J. Super. 95, 105 (App. Div. 1954), affirmed 18 N.J. 163 (1955). In that sense we have no doubt the proof justified the conclusion that the presence of the mounds concurrently with the absence of any warning signs of a customary nature was at least a "substantial factor" in producing the accident. In this connection there has been an assumption in the argument that there is only one probable hypothesis as to how the car went over the bulkhead, i.e., upright through the air from the mound, touching a tire to the bulkhead in flight. But as we read the testimony it is equally possible, and even more plausible, that the car turned end over end after its first impact with the mound, going over the low bulkhead and *262 landing right side up on the beach (see Exhibit P-6, a photograph of the car). There was evidence that there were no tire tracks between the first mound presumably hit and the bulkhead, but none from which it would have to be found that the car did not again make contact with the ground before going over the bulkhead. It would indeed be hard for an observer of the scene after the accident to say exactly what happened in view of the testimony as to the closeness with which the materials were dumped. Viewed in the light of this alternative possibility as to the course of the vehicle, the jury could have found proximate cause in the additionally relevant sense that the result was within the realm of foreseeability, as a consequence of the existent physical conditions, in respect to an unwary and unwarned traveller by automobile suddenly coming upon the mounds at the rate of speed a night motorist might reasonably have been expected to be driving under the circumstances. Bacak v. Hogya, 4 N.J. 417, 424 (1950). It is not necessary that the tort-feasor anticipate the very occurrence which resulted so long as it can be said that the injury was the natural and probable consequence of the wrongful act and that it was within the realm of foreseeability that some harm might result to the plaintiff. Ibid. As in the Latzoni case, supra, "the jury could have * * * found * * * a highway trap for want of barricades, adequate lighting and warning to the unknowing and unsuspecting traveler misled by the semblance of a continuous roadway * * *" (22 N.J., at page 90).
There was a jury issue as to proximate cause. Cf. Beyer v. White, 22 N.J. Super. 137, 143 (App. Div. 1952); McManus v. New Jersey Water Co., 22 N.J. Super. 253 (App. Div. 1952).

V.
In considering the defense of contributory negligence it must first be remembered that the burden of proof was on the defendants and that on a motion to dismiss at *263 the end of plaintiff's case every legitimate inference derivable from any of the proofs in favor of the plaintiff was required to be indulged in opposition to the motion. Mellon v. Pennsylvania-Reading Seashore Lines, 7 N.J. 415 (1951). It was entirely possible, whether or not we as individuals think it likely, that the decedent was misled by the absence of any warning signs or lights into assuming that the road ran indefinitely ahead and could be traversed notwithstanding what might have appeared to him to be a part of the roadway under repairs but not in such a condition of impassability as would normally have been accompanied by the precaution of barricades or lanterns; and that, whether he slowed down or not, he was unavoidably catapulted over the bulkhead. We cannot say that fair-minded men might not have differed as to the probability of that hypothesis or of some other explanation of the end result consistent with probability and with the exercise of ordinary care by the decedent. Suburban Electric Co. v. Nugent, 58 N.J.L. 658 (E. & A. 1896). The suggestions of intoxication fell far short of proof which would have fairly compelled such a conclusion by a jury and of consequential contributory negligence. See Shelly v. Brunswick Traction Co., 65 N.J.L. 639, 642 (E. & A. 1900); Damchuk v. Public Service Ry. Co., 5 N.J. Misc. 365 (Sup. Ct. 1927); Vanderbeek v. Conlon, 41 N.J. Super. 574 (App. Div. 1956).
The alleged contributory negligence cannot be clearly seen conclusively as a fact or by necessary and exclusive inferences from the plaintiff's proofs. Danskin v. Pennsylvania R.R. Co., 79 N.J.L. 526, 527-529 (E. & A. 1910); Gudnestad v. Seaboard Coal Dock Co., 15 N.J. 210, 222 (1954). Only in the clearest case of contributory fault, where the contrary hypothesis is not fairly admissible, does the question become one of law for the court. Battaglia v. Norton, 16 N.J. 171, 179 (1954).
In view of our conclusions on the proofs we have not found it necessary to decide whether, as contended by plaintiff, the condition here presented was an absolute nuisance rather than a nuisance grounded in negligence so as to obviate the *264 applicability of the defense of contributory negligence, within Hammond v. County of Monmouth, 117 N.J.L. 11, 15, 16, 17 (Sup. Ct. 1936). For a stimulating criticism of the rule see Seavey, "Nuisance: Contributory Negligence and Other Mysteries," 65 Harv. L. Rev. 984 (1952).
Our consideration of all of the issues leads to the conclusion that the judgment under appeal should, as to both defendants, be
Reversed.