72 N.J. Super. 288 (1962)
178 A.2d 249
LAWRENCE E. CASEY, AND UNION PRINTERS LEAGUE OF NEW JERSEY, PLAINTIFFS,
v.
RAYMOND MALE, COMMISSIONER OF THE DEPARTMENT OF LABOR AND INDUSTRY OF NEW JERSEY, DEFENDANT, AND THE EVENING NEWS PUBLISHING COMPANY, A NEW JERSEY CORPORATION, AND MORNING LEDGER COMPANY, A NEW JERSEY CORPORATION, INTERVENORS.
Superior Court of New Jersey, Law Division.
Decided January 31, 1962.
*291 Mr. Thomas L. Parsonnet appeared for the plaintiffs (Messrs. Parsonnet, Weitzman and Oransky, attorneys).
Mr. Stephen F. Lichtenstein, Deputy Attorney General, appeared for the defendant (Mr. David D. Furman, Attorney General, attorney; Mr. Raymond H. Leahy, Deputy Attorney General, on the brief).
Mr. John H. Yauch appeared for the defendants-intervenors (Messrs. Yauch and Fagan, attorneys; Mr. Frank J. Peterpaul, on the brief).
WAUGH, A.J.S.C.
This is an action in lieu of prerogative writs in the nature of a mandamus brought by the plaintiffs, Casey and Union Printers League of New Jersey. Plaintiffs seek an order requiring the defendant, the Commissioner of Labor and Industry, to enforce the appropriate provisions of the Factory Safety Law, R.S. 34:6-1 et seq. with regard to all newspaper publishing plants in the State.
Application on behalf of the Publishers Bureau of New Jersey and the New Jersey Press Association for leave to appear as amicus curiae in the action was denied. See Casey v. Male, 63 N.J. Super. 255 (Law Div. 1960).
Thereafter, the Evening News Publishing Company, a New Jersey corporation, and the Morning Ledger Company, also a New Jersey corporation, were given leave to, and have intervened.
The entire matter has been submitted on stipulated facts. Several matters of admissibility of evidence were raised and *292 have been previously decided. See Casey v. Male, 65 N.J. Super. 428 (Law Div. 1961).
The issues to be determined as settled in the pretrial order are as follows:
(1) Are the provisions of R.S. 34:6-1 et seq. applicable with regard to newspaper publishers who print and sell only newspapers? If so, what section or sections are applicable?
(2) If the first question is answered in the negative, must the Commissioner consider newspaper publishers who, in addition to printing and selling newspapers, produce and sell matrices and photoengravings in the same plant in which they print newspapers, as engaged in manufacturing, so as to bring them within the scope of R.S. 34:6-1 et seq., or any section thereof?
(3) If the production and sale of matrices or photoengraving in the same plant in which newspapers are printed bring the plant within the coverage of R.S. 34:6-1 et seq., or any section thereof, is the Commissioner obligated to enforce the Factory Safety Law with regard to such newspaper publishers where such additional activity constitutes a very minute part of their total activity, or is the Commissioner obligated to enforce the said chapter only with regard to newspaper publishers whose activity in producing and selling matrices and photoengraving constitutes a certain percentage of their total activity?
(4) If the latter is the answer, to what degree must the newspaper publishers engage in the production and sale of matrices and photoengravings in order to come within the coverage of the Factory Safety Law?
A distinguished former Attorney General, John W. Wescott, by memorandum opinion dated October 5, 1915, involving a construction of the underlying statute, informed the then Commissioner of Labor that "the answer to your question involves considerable difficulty"; and in the same opinion, he states "I have examined the Act (L. 1904, c. 64, p. 152) in an effort to learn the intention of the Legislature and have found so many evidences of, apparently, *293 conflicting intentions that I am unable to construe this Act with confidence in the accuracy of my construction."
Since that opinion, many supplements and amendments have been enacted, repealers have passed, social legislation has been brought together in one place under Title 34 in the Revision of 1937. The legislative intention can only be gleaned from a study of the separate underlying legislation.
It is stipulated in the pretrial order of this case, in part, that
"The position of the Department of Labor and Industry as early as 1927 was that newspaper publishers who print and sell newspapers only were subject to the regulatory provisions of R.S. 34:6-1 et seq., or any applicable sections thereof. The Department instructed its inspectors that such concerns were to be treated as factories and violations reported. This position continued until Formal Opinion No. 8 of the Attorney General, issued May 20, 1952, held that newspaper plants were not subject to the cited regulatory requirements. The reports of inspections up to May 20, 1952 included plants of the larger publishers, which printed only newspapers, such as the Atlantic City Press, the Camden Courier and those included in a list (designated as Exhibit 1) attached to this [the] stipulation."
The Evening News Publishing Company and Morning Ledger Company are included in the list.
"Subsequent to May 20, 1952, after the issuance of and in accordance with the Attorney General's Opinion, the plants of those publishers in which only newspapers were printed and sold were not inspected by the Bureau of Engineering and Safety of the Department of Labor and Industry. * * *"
The plaintiff urges that the legislative intent was to regulate and effect all places of employment in which any hazard might occur, and that the sections of R.S. 34:6-1 et seq. are not limited to factories or places of manufacture, but include all industrial places of business. They urge a consideration of the language in the following sections of the Revised Statutes, namely R.S. 34:6-1, 24, 47, 48, 58, 60, 62, 66, 67, 99, and 141.
*294 R.S. 34:6-1 uses the phrase, "Every factory, workshop, mill or place where the manufacture of goods of any kind is carried on." Sections 24, 47 and 60 use the same general language.
R.S. 34:6-48 uses the term "Every employer."
R.S. 34:6-58 uses the phrase, "All employers conducting a manufacturing business and using emery wheels."
R.S. 34:6-62 uses the language, "Any factory, workshop, mill or place where the manufacture of goods is carried on where machinery is used."
R.S. 34:6-66 uses the phrase, "Every factory, workshop or mill shall contain * * *."
R.S. 34:6-67 uses the phrase, "Factories and workshops in which women and children are employed."
R.S. 34:6-99 uses the phrase, "Any place or establishment where metal castings or cores are made."
R.S. 34:6-141 requires:
"Every person engaging in any productive industry within the supervision of the department, as a factory, workshop, mill, newspaper plant, printery, or commercial laundry shall register the same with the commissioner before the commencement of business, giving the legal name, home address, the nature of business, the maximum number of persons to be employed, and such other data as the commissioner may require." (Emphasis added)
R.S. 34:1-6 provides:
"The commissioner shall enforce the provisions of this title and exercise supervision and control over the deputy commissioners, bureau chiefs and all inspectors, and shall, as often as is practicable, cause inspections to be made of all establishments and places regulated or affected by this title." (Emphasis added)
The plaintiffs urge that a consideration of all of chapter 6 (R.S. 34:6-1 et seq.) together with R.S. 34:1-6 should lead to the conclusion that it was the legislative intent that all places of employment in which any hazard might occur (not only factories) were to be regulated. They contend that many sections of chapter 6 are general and therefore apply to all employers; that the definition of foundry in *295 R.S. 34:6-99 as "any place or establishment where metal castings or cores are made," taken in conjunction with the admission that "type metal * * * is used by all newspaper plants and is melted and cast into molds and type"; and the mandate of R.S. 34:6-141 requiring newspaper plants and printeries to register with the Commission, all lead to the conclusion that newspaper plants are covered.
Our first inquiry, then, should be to determine what employers or places of employment are covered by R.S. 34:6-1 et seq. A reading of the language of the revision might lead to the conclusion suggested by the plaintiffs. It is a rule of law frequently stated with respect to the Revised Statutes of 1937 that "there is a presumption against a legislative intent to effect a change in substance by a revision of the general laws." Hartman v. City of Brigantine, 42 N.J. Super. 247, 255 (App. Div. 1956), affirmed 23 N.J. 530 (1957); Garifine v. Monmouth Park Jockey Club, 29 N.J. 47, 58 (1959).
It is necessary, then, to trace the language to the original enactments.
Social legislation regulating hours and conditions of work had its original development in two series of legislative development.
One series, regulating employment, safety, health and work hours in factories and workshops and appointing a "factory and workshop inspector," had its origin in L. 1885, c. 168, p. 212. This act was amended and supplemented by L. 1887, c. 177, p. 243, and L. 1889, c. 287, p. 446.
The second series regulated employment hours and conditions of women and children and appointed an inspector for its enforcement, and had its origin with L. 1883, c. 57, p. 59. This act was supplemented by L. 1884, c. 137, p. 200, which makes the title of the inspector the "factory and workshop inspector" whose duty was "to enforce the provisions of this act, and all other laws relating to sanitary conditions of factories and workshops." Further supplements were enacted by L. 1886, c. 83, p. 106, and L. 1902, c. 271, p. 799.
*296 Both series of legislative development were repealed by L. 1904, c. 83, p. 196. In that year c. 64, p. 152 was enacted.
The first supplement to this act was L. 1905, c. 102, p. 203, which act states in section 1:
"For the purposes of this act and the act to which it is a supplement biscuits, pies, bread, crackers, cakes and confectionary shall be interpreted to be goods, and places wherein the same are made or manufactured shall be held and considered as places where goods are manufactured."
This indicates clearly that the original language in L. 1904, c. 64, did not have the broad sweep the plaintiffs attribute to it. L. 1912, c. 127, p. 180, which repealed the 1905 supplement, is the source for R.S. 34:6-105 and brought bakeries within the scope of the Factory Safety Law.
Quarry and mine workers, covered by R.S. 34:6-68 to 98, seem to have been covered first in L. 1919, c. 187, p. 400.
R.S. 34:6-48, using the term "Every employer," is derived from L. 1914, c. 162, p. 296. Section 1 of that act states:
"Every employer shall, without cost to the employees, provide reasonably effective devices, means and methods to prevent the contraction by his employees of any illness or disease incident to the work or process in which such employees are engaged."
Section 2 defines dangerous work and processes. Section 3 states that: "Duties of employers to provide safety appliances for the protection of employees in especially dangerous works or processes." Section 5 requires notices by all employers engaged in any of the processes mentioned in section 2, i.e.:
"(a) Every work or process in the manufacture of white lead, red lead, litharge, sugar of lead, arsenate of lead, lead chromate, lead sulphate, lead nitrate, or fluo-silicate is hereby declared to be *297 especially dangerous to the health of the employees who, while engaged in such work or process are exposed to lead dusts, lead fumes or lead solutions.
(b) Every work or process in the manufacture of pottery, tiles, or porcelain enameled sanitary ware is hereby declared to be especially dangerous to the health of the employees who, while engaged in such work or process, are exposed to lead dusts or lead solutions."
A consideration of the language of this act, together with the title which reads:
"An Act to prevent lead poisoning and other occupational diseases and providing penalties for the violation of its provisions."
and which may be considered as an aid to construction, "operates as a limitation on the enacting clauses, so that a construction which would give the statute a direct effect beyond the object expressed in the title must be rejected." Samuel D. Wasserman, Inc. v. Klahre, 24 N.J. Super. 143, 147 (App. Div. 1952). I therefore conclude that R.S. 34:6-48 et seq. was intended to cover workers in certain manufactures, and the term "Every employer" referred to the manufacturers covered and does not cover newspaper plants.
The court next considers R.S. 34:6-99. This section is derived from L. 1911, c. 206, p. 437, which act is a supplement to L. 1904, c. 64. While it defines foundry in the exact language of the original statute, it is clear that the statute seeks to control foundries, not newspaper plants where part of the operation is melting and casting molds and type.
If defendant, then, comes within the purview of R.S. 34:6-1 et seq., it must be by reason of L. 1904, c. 64, p. 152, and its amendments or supplements. An examination of that statute is helpful.
R.S. 34:6-1 is derived from L. 1911, c. 214, p. 448 which is a supplement to L. 1904, c. 64, p. 152. Each statute in section 1 uses the phrase "factory, workshop, mill or place where the manufacture of goods of any kind is carried on."
*298 R.S. 34:6-58 is derived from section 14 of L. 1904, c. 64, p. 157. Section 14 reads in part:
"All corporations, firms or persons conducting a manufacturing business in any of the places coming under the provisions of this act, where emery wheels * * *." (Emphasis added)
These emphasized words are omitted in the revision, but under the rule of law stated in Hartmann, supra, the court will not presume an intention to change the substance of the act. Obviously, the reference is to be considered in connection with the title and the complete original act. I conclude it means any "factory, workshop, mill or place where the manufacture of goods of any kind is carried on."
The same omission of the underlined language is noted in R.S. 34:6-62, which is derived, in part, from L. 1904, c. 64, § 13, p. 156. The same rule of law applies.
It must be conceded that R.S. 34:6-66 and 67 are derived from sections 23 and 24 of L. 1904, c. 64, and the original sections refer to factory, workshop or mill without qualification. But, it is evident that the Legislature meant these sections to apply to those covered by the act, namely, "factory, workshop, mill or place where the manufacture of goods of any kind is carried on."
A consideration of the several sections of this entire chapter 6 of R.S. 34:6-1 et seq. of the Revision leads me to the conclusion that the covered places of employment are quarries, mines, bakeries, foundries, and the broad class of "factory, workshop, mill or place where the manufacture of goods of any kind is carried on."
The court concludes, further, that in construing the words "where the manufacture of goods of any kind is carried on," they modify the words "factory, workshop, mill or place." See Formal Opinion of the Attorney General, 1958, No. 13. It is for this further reason the court finds the plaintiffs' argument that all places of employment are within R.S. 34:6-1 et seq., is without merit.
*299 It is true that in the Revision the title of chapter 6 reads:
"INSPECTION AND REGULATION OF FACTORIES, MINES, WORKSHOPS AND OTHER INDUSTRIES."
But, again, we must consider the underlying legislation. The court has heretofore traced the reasons for including bakeries, quarries and mines, dangerous processes of manufacture, and foundries. The factories and workshops were introduced into this chapter through the term "factory, workshop, mills or places." (Note the omission in the title to chapter 6 of "mills.") The title must be construed upon a consideration of the phrase and not by using the words "workshops and industries" out of their original context.
The court's view is further supported by Griffith v. Mountain Ice Co., 74 N.J.L. 272 (Sup. Ct. 1907) which held a plant engaged in gathering natural ice from Lake Hopatcong was not a "factory" or "workshop" within the meaning of section 3 of the Factory Safety Law, which required protective guards for "belting, shafting, gearing and drums in all factories and workshops." The court states, at page 273:
"* * * Obviously the statute was not intended to apply to all cases in which shafting, belting and gearing were employed, for if that had been the legislative purpose, the limitation `in factories and workshops' would not have been used. Some meaning must therefore be given to these words of limitation, and the one I have suggested is that naturally arising from the context. * * *"
It is apparent that the term "factory and workshops" is limited to manufacturing establishments. The same limitation applies to the word "industry." If newspaper plants are not manufacturing establishments within the common understanding of the term, the words "factory," "workshops," and "industry" under R.S. 34:6-1 et seq. do not apply to them.
The next problem, then, is whether a newspaper plant is a "manufacturing establishment" or a person "engaged in manufacturing." Plaintiffs contend that newspaper publishers *300 do come within the meaning of manufacturers as expressed in R.S. 34:6-1 et seq. Defendants, however, relying on Evening Journal Association v. State Board of Assessors, 47 N.J.L. 36 (Sup. Ct. 1885), and Press Printing Co. v. State Board of Assessors, 51 N.J.L. 75 (Sup. Ct. 1888), argue that a newspaper is not a manufacturer within the terms of the act.
In Evening Journal the plaintiff, whose activities were limited to the printing and publishing of a newspaper, argued that it was a "manufacturing company" and therefore was entitled to an exemption from an annual tax or license fee of 1/10th of one percent of the capital stock of the corporation. The act exempted manufacturing companies. After citing In re Kenyon & Fenton, 1 Utah 47 (Sup. Ct. 1872), which held a newspaper publisher, which also conducted a book and job printing business, to be a "manufacturer" within the terms of the Bankruptcy Act; and In re the Capital Publishing Co., 3 MacArthur Rep. 405 (Sup. Ct. D.C. 1877), which held a publisher of a weekly newspaper was not a "manufacturer" within the meaning of the Bankruptcy Act; the court held that a newspaper publisher was not a "manufacturer" in the ordinary or legal sense, stating at pages 41, 42:
"* * * It is true that in the production of his papers, which he sells, he employs manual labor and mechanical skill. * * * [But] In the ordinary and general sense of the word `manufacturer,' the publishing of a newspaper does not come within the popular meaning of the term. As was said in the case last cited, [In re the Capital Publishing Co., supra] `no definition of the word "manufacturer" has ever included the publisher of a newspaper, and the common understanding of mankind excludes it. * * * in the whole history of newspapers from the close of the seventeenth century, this word "manufacturer" has never been applied to them or appropriated by them in the whole range of English literature. * * *'
A newspaper has intrinsically no value above that of the unprinted sheet. Indeed, it has less value, considered intrinsically, as a mere article of merchandise. Its value to its subscribers arises from the information it contains, and its profit to the publisher is derived, in a great measure, from the advertising patronage it obtains by reason of the circulation of the paper induced by the enterprise and ability *301 with which it is conducted. Neither in the nature of things nor in the ordinary signification of the language, would a newspaper be called a manufactured article or its publisher a manufacturer."
In Press Printing Co., supra, the plaintiff was a publisher of newspapers, books and in the business of job printing. There, too, it sought to take advantage of the tax exemption. The court held at page 77:
"The prosecutor is a manufacturing company within the exemption, so far as concerns its business of printing and publishing books and general job printing; but it is not such a company, within the meaning of the statute with respect to its business of printing and publishing a newspaper. In one sense, the prosecutor is a manufacturing company; in another sense it is not; and it cannot claim exemption under the statute on business which is not within the proviso, on the ground that part of the capital is employed in a business which falls within the proviso."
In State v. Crounse, 105 Neb. 672, 181 N.W. 562, 16 A.L.R. 533 (Sup. Ct. 1921), the court held that a newspaper publishing company, engaged exclusively in printing and publishing a daily newspaper, though it employs machinery and mechanical labor in its operation, was not a manufacturer. The court construed a statute regulating the working hours of women in "manufacturing, mechanical or mercantile establishment(s)." The court stated, 181 N.W., at page 563:
"The work which characterizes the business of publishing a newspaper is the gathering and disseminating of news, the furnishing to subscribers of various kinds of information, the carrying of advertisements, and the writing of editorials and articles on matters of public interest. Machinery and mechanical labor are indispensible, but are only incidental to the carrying on of the main purpose of the business. A newspaper is the product of intellectual effort, not of mechanical labor. That such business is not manufacturing is supported by the following decisions: [citing cases]."
See Oswald v. St. Paul Globe Pub. Co., 60 Minn. 82, 61 N.W. 902 (Sup. Ct. 1895), where the court stated at page 903:
"* * * The business of publishing an ordinary daily or weekly newspaper is at most only partly a manufacturing business, and *302 that part is merely incidental to the main or principal part of the business, which is collecting * * * news, preparing and selling literary work, and other editorial work. * * *"
However, see State v. Dupre, 42 La. Ann. 561, 7 So. 727 (Sup. Ct. 1890), where the court held a newspaper plant was a manufacturer.
Plaintiff cites Bates Machine Co. v. Trenton, &c., R.R. Co., 70 N.J.L. 684 (E. & A. 1904), which held the production of electricity constituted manufacturing within the Mechanics' Lien Act. The court's holding was based upon the meaning of the word "manufacture" in the "language of common people in speaking generally of mechanical enterprises." (at p. 689) However, the weight of authority, as noted, is that common understanding of the term "manufacture" does not include newspaper plants.
While the court recognizes that the New Jersey cases involve tax assessment problems, and the statutes here involved are in part remedial and in part penal, the remedial provisions to be liberally construed and the penal provisions to be strictly construed, State v. Meinken, 10 N.J. 348, 352 (1952), yet, where the authority in the country is divided on the question whether a newspaper is a manufacturer, this court should follow the precedents of the highest appellate court of this State, even though the decisions involve a taxation rather than a social problem. Under the authority of Evening Journal Association v. State Board of Assessors, supra, and Press Printing Co. v. State Board of Assessors, supra, I come to the conclusion that a newspaper publishing company, engaged exclusively in printing and publishing a daily or weekly newspaper, is not a "factory, workshop, mill or place where the manufacture of goods is carried on" within the meaning of the term under R.S. 34:6-1 et seq.
Another problem of construction in this case arises from R.S. 34:6-141, which states:
"Every person engaging in any productive industry within the supervision of the department, as a factory, workshop, mill, newspaper plant, printery, or commercial laundry shall register the same *303 with the commissioner before the commencement of business, giving the legal name, home address, the nature of the business, the maximum number of persons to be employed, and such other data as the commissioner may require."
This section is relied upon by the plaintiffs as conclusive of the legislative intent to include newspapers.
The section originated in L. 1904, c. 64, § 29, p. 161, which reads in part:
"Every corporation, firm or person shall within one month after he, they or it shall begin to occupy a factory, workshop, mill or place where the manufacture of goods of any kind is carried on, * * *."
Newspaper plants were not included. This section was amended by L. 1925, c. 117, p. 338, which read:
"Every person, firm or corporation which now or hereafter shall engage in any productive industry coming under the supervision of the Department of Labor as a factory, workshop, mill, newspaper plant, printery, or commercial laundry shall register the same with the Commissioner of Labor before the commencement of business, giving the legal name, home address, the nature of the business, the maximum number of persons to be employed, and such other data as the Commissioner of Labor may require."
Between 1904 and 1925, bakeries were brought within the supervision of the Department of Labor. L. 1905, c. 102, p. 203. Employers of dangerous work and processes were brought in by L. 1914, c. 162, p. 296; foundries by L. 1911, c. 206, p. 437; quarry workers by L. 1919, c. 187, p. 398; and female laundry workers by L. 1912, c. 216, p. 337. By 1925 newspaper plants had been brought within the orbit of the Department of Labor. In L. 1914, c. 60, p. 99, an act to amend the title and section 1 of L. 1904, c. 64, p. 152, was enacted. Section 1 was amended to read as follows:
"No child under the age of fourteen (14) years shall be employed, allowed or permitted to work in any newspaper plant, printery, factory, workshop, mill, commercial laundry, or place where printing or the manufacture of goods is carried on; * * *." (Emphasis added)
*304 This act was passed March 26, 1914; yet by L. 1914, c. 236, p. 488, enacted on April 17, 1914, the Legislature further amended L. 1904, c. 64, § 1, and the title. Section 1 was amended to read:
"No child under the age of fourteen (14) years shall be employed, allowed or permitted to work in any factory, workshop, mill or place where the manufacture of goods of any kind is carried on, or in any mine or quarry; * * *."
Note that no mention is made in the title, or section 1, of newspaper plants or printeries.
Again, on April 17, 1914, by L. 1914, c. 252, p. 523, section 1 is amended further without a reference in the title, or section 1, to either newspaper plants, printeries or mines and quarries.
In 1923, by L. 1923, c. 80, p. 158, again we find the title mentioning "newspaper plants, printeries * * * commercial laundries * * * and * * * mines and quarries." They are also included in section 1 of this amendment.
After the 1925 amendment the title was again amended (see L. 1928, c. 108, p. 222), and again it included newspaper plants, printeries, etc. No section of the act itself was amended. Undoubtedly the reason for amending the title was the fact that in 1925, on the same day L. 1904, c. 64, § 29 was amended by L. 1925, c. 117, p. 338, the supplement to L. 1904, c. 64, p. 152, passed in 1911 (see L. 1911, c. 206, p. 437) was amended by L. 1925, c. 119, p. 340, using the original title without including newspaper plants and printeries.
The answer to plaintiffs' contention is that the only section of L. 1904, c. 64, ever amended to include newspaper plants and printeries was section 1, and that section is concerned with child labor. That section was removed from the Factory Safety Law by the revisors in the Revision of 1937 and placed in R.S. 34:2-1 et seq. where it properly belongs because a much broader coverage developed with *305 respect to child labor than to merely manufacturing establishments. See Historical Note under R.S. 34:2-2. In 1940, R.S. 34:2-2 to R.S. 34:2-21 was repealed and a new child labor law regulating the employment of all minors (except in agricultural and domestic services) was enacted. L. 1940, c. 153, p. 331; N.J.S.A. 34:2-21.1 to 21.22.
That the primary object of section 1 of L. 1904, c. 64 (later R.S. 34:2-2) is for the protection of children has been judicially declared in Feir v. Weil, 92 N.J.L. 610 (E. & A. 1919).
Since child labor in newspaper plants and printeries was subject to the control of the Department of Labor, it was necessary to bring newspaper plants within the registration requirement of R.S. 34:6-141. I note that no other section under the whole of Title 34 makes provision for registration.
It could be argued that the Legislature, by amending L. 1904, c. 64, sec. 1 and sec. 29, to include newspaper plants, effected a change in every section of the act, so that the reference in other sections to places "coming within the provisions of this act" referred also to newspaper plants. I find the argument without merit.
The strongest argument against the plaintiffs' contention in this matter is that the Legislature did, in fact, see fit to amend the 1904 act, namely, sections 1 and 29, to include newspaper plants and printeries. If the language "factories, workshops, mills and places where the manufacture of goods of any kind is carried on" had the all embracive intention of "all places of employment in which there might be any hazard," then the amendment would have been unnecessary.
I come to the conclusion that the words "where the manufacture of goods of any kind is carried on" modify "factory, workshop, mill or place," and that the Legislature intended to include newspaper plants and printeries only with respect to the child labor laws and registration, and not otherwise.
*306 It may very well be that other beneficent provisions of R.S. 34:6-1 et seq. should be made applicable to newspaper plants and printeries, but that decision is within the sound discretion of the Legislature and not for the courts.
In addition to the main question of issue number 1, the court is asked to determine issues number 2, 3 and 4, stated above. With respect to these questions, the court holds that it is being asked to reply to mere "speculative inquiries, to be converted into legal aid bureaus." Hildebrandt v. Bailey, 65 N.J. Super. 274 (App. Div. 1961).
So long as the newspaper plant uses matrices and photoengravings as a necessary and integral part of the process in the publication of a newspaper, it cannot be said that they come within the provision of this section, even though their customers may acquire these items for use elsewhere.
However, situations may exist, or come into existence, where separate legal entities or separate departments may be set up to produce matrices and photoengravings. When such a factual situation presents itself, then the court will entertain that factual issue and decide the application of the statute to it.